In the Matter of the Estate of Virginia Tryon Kent, Deceased.

Surrogate's Court, New York County, December 5, 1932.

*Philip W. Lowry*, for residuary legatees, the objectants.

*Blumberg & Parker* [*Henry L. Flattau* of counsel], for Percy Rockwell Kent and Virginia Tryon Kent Burt (legatees).

*Walter B. Safford*, for general legatees.

*Edwin A. Falk* [*Edwin A. Falk* and *Charles Trynin* of counsel], for Alice K. Stoddart (the elder), as general legatee and as residuary legatee, and other general legatees.

*Murray L. Jacobs* [*Edmond Nathaniel Cahn* with him on the brief], attorney and counsel for Manufacturers Trust Company, executor.

FOLEY, S. In this contested accounting proceeding, the principal issues raised by the objections to the account involve an attempted surcharge against the corporate executor for its failure to sell the securities taken over from the decedent at the time of her death and still retained within the estate. Mrs. Kent, the testatrix, died February 19, 1930. Letters testamentary were issued to the accounting executor on April 26, 1930. The principal asset of the estate consisted of 4,736 shares of the common stock of the General Electric Company, which were appraised, as of the date of her death, at $73 7/8 per share, or a total of $349,872. Within the estate there was also a block of 332 shares of the Goldman Sachs Trading Corporation, valued as of the date of death at $13,487.50, or approximately $41 per share. The remaining assets consisted of real estate, shares of stock and personal effects appraised at approximately $30,000. No serious dispute has arisen as to the administration of the last group of assets.

Mrs. Kent's will and codicil provided pecuniary legacies of

$121,550 and created two trusts aggregating $10,000, or a total of $131,550. The residuary estate was bequeathed in one-third parts to her stepdaughter, Mrs. Alice Kent Stoddard, and her two nieces, Virginia Lowrey Pierson and Juliet Tryon Baggallay. Each of the three residuary legatees received pecuniary legacies within the group mentioned above in the sum of $5,000.

At the time of the qualification of the executor, on April 26, 1930, the stock of the General Electric Company had increased in value per share to about $90. It has been estimated that the sum of $80,000 is needed to pay the debts, funeral expenses, administration expenses and taxes in the estate. When this sum is added to the total of the pecuniary legacies and trusts, there was required approximately $210,000 before the amount of the residue could be ascertained and fixed. The tentative residue, based upon values as of the time of the qualification of the executor, would have been about $250,000.

In the course of the administration of the estate, certain of the minor assets have been liquidated. The entire block of the General Electric Company's stock and the shares of the Goldman Sachs Trading Corporation have been retained. The liability of the executor for its failure to liquidate these securities is asserted by the three residuary legatees and by certain of the general legatees.

The determination of the question has not been without difficulty, particularly, because of the voluminous testimony and numerous exhibits which have been submitted by the parties in the course of the hearings held by the surrogate. The present account is a voluntary one. It is an intermediate account. It was filed as the result of a compulsory proceeding brought against the executor. The latter proceeding was initiated in the month of June, 1931. The account here was filed on August 30, 1931.

The questions presented are those which have frequently arisen in estates in recent months as a direct result of the existing financial depression and the shrinkage in security values. These questions, briefly stated, are: At what date should the executor have sold the securities, and particularly the General Electric stock? Under the circumstances, what was a reasonable period for liquidation? Should the stock have been disposed of at the end of one year after the issuance of letters testamentary, or before the last date of the transaction set forth in the account, approximately fourteen months after the issuance of letters? Did the executor act in good faith and without negligence throughout the period of administration? Is it to be surcharged for failure to sell during the period of the account?

There is in evidence the range of the market price of the stock

of the General Electric Company and of the Goldman Sachs Trading Corporation for a period of some months before the date of death of the decedent, during the period of the account, and for several months' after the last date covered by the account. The former stock was dealt in on the New York Stock Exchange. The latter was traded in upon the New York Curb Exchange.

As to the General Electric it appears that the selling price as of the date of death, February 19, 1930, was approximately seventy-four dollars per share.

At the date of the issuance of letters, upon April 26, 1930, the range for the week ending on that date was eighty-eight to ninety-three, an average of about ninety dollars per share.

Six months after the issuance of letters, on October 26, 1930, the range for the week was approximately forty-eight to fifty-four, or an average of about fifty-one dollars per share. One year after the issuance of letters on April 26, 1931, the range was from forty-one to forty-five, an average of about forty-three dollars per share. For the last week of the period set forth in the pending account, ending June 22, 1931, the range was from thirty-eight to forty-three, and the average was forty dollars and fifty cents per share.

With reference to the Goldman Sachs stock, which consisted of a relatively small block of 332 shares, the decline in market price was faster. At the date of the issuance of letters, its average was about forty-five. Two months later the price had fallen to an average of twenty. At the end of six months from the date of the issuance of letters it had reached an average of eleven. At the end of one year from the issuance of letters it had reached a selling price of about eight dollars per share. At the time of the last date set forth in the account it had fallen as low as five dollars. A further shrinkage in the market value of both stocks has taken place since June 22, 1931.

At the outset I specifically hold that the objections to the account raise the question as to the liability of the executor for its failure to sell only during the period of the account, to wit, from April 26, 1930, to June 22, 1931, a period of approximately fourteen months. The decree can only settle matters contained in the account. (Surr. Ct. Act, § 274.) Any liability for failure to sell after the last named date must be raised in a new accounting proceeding covering the subsequent transactions of the executor. An alternative method of the disposition of these subsequent transactions and one perhaps less expensive, might be employed by filing a supplemental account in the pending proceeding, procuring supplemental citation to be issued and served, and by determining the new issues covering the subsequent period of the supplemental

account upon proper objections filed thereto. All issues might thus be adjudicated by the single final decree.

The rules applicable to the responsibility of a fiduciary have been recently restated by the Court of Appeals in *Matter of Clark* (257 N. Y. 132). While that case involved the duty of trustees, its terms covered also the general rules pertinent to executors. There is attached to the relation of trustee " a duty to be faithful, to be diligent, to be prudent " in an administration intrusted to him.

(1) The trustee " is bound to employ such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs." (Citing *King* v. *Talbot*, 40 N. Y. 76.)

(2) In determining whether the acts of a trustee have been prudent, we must " look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place " (*Purdy* v. *Lynch*, 145 N. Y. 462, 475); " for it is an obvious truth that ' a wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by.' " (*Costello* v. *Costello*, 209 N. Y. 252, 262.) It is impossible to say that trustees are lacking in sound discretion " simply because their judgment turned out wrong." (Per HOLMES, Ch. J., in *Green* v. *Crapo*, 181 Mass. 55, 58.)

(3) Distinction is to be made in a situation similar to that involved in the pending proceeding as between new investments made by the executor or trustee, and the failure to make prompt disposition of securities received from the decedent. The purchase of a speculative stock is quite different from the retaining of a stock taken over, having in mind the arrival of a favorable opportunity to sell.

(4) Finally, negligence and a mere error of judgment are to be distinguished. " Trustees acting honestly, with ordinary prudence and within the limits of their trust, are not liable for mere errors of judgment." (Citing *Matter of Chapman*, [1896] 2 Ch. 763, 776.)

The more detailed duties and responsibilities of an executor (as compared with a trustee) in situations such as exist here are analyzed in the leading cases of *Matter of Weston* (91 N. Y. 501) and *Matter of Varet* (181 App. Div. 446; affd., 224 N. Y. 573).

In the present proceeding testimony has been submitted in behalf of the executor establishing continued vigilance by the frequent investigation of the financial affairs of the General Electric Company made periodically by the executor's officers and employees. These investigations covered the examination of current reports in three different publications of recognized standing in financial circles. There was also examined from time to time certain indices, and so-called barometers of conditions of general business and financial

affairs throughout the United States, and specifically, indices and reports in the electrical industry. As in *Matter of Clark (supra)*, the securities here had been a favorite investment of the testatrix over a long period of years. She had held the General Electric stock for a considerable time. Consultation was had by the representatives of the executor and advice was sought from persons regarded as experts in the utility and electrical field. The General Electric Company had been regarded as the largest and most successful concern of its kind in America. Its business activities covered research laboratories, railroad electrification, lighting plants, refrigeration, the manufacture and sale of electrical and radio equipment, household devices and numerous other articles. In the year 1930 it had earned its regular dividend. Earnings began to decline in the year 1931.

Upon the oral testimony and the numerous documents in evidence I find no ground for a surcharge of the executor for failure to sell either of these securities up to June 22, 1931, the last date of transaction covered by the account. There is no evidence of bad faith or fraud or lack of prudence or want of diligence in the specific part of the administration of the estate which has been the subject of the objections filed to the account. As in *Matter of Clark (supra)*, it was an error of judgment for the executor not to have sold during the first few months after the issuance of letters. The executor was not, however, lacking in the exercise of care. The greater part of the shrinkage occurred in the first six months of administration. General Electric, at the expiration of that period, had reached an average of fifty-one. At that point the residue had been greatly reduced. Prudence might well have dictated at this point a holding of the securities in the expectation of an increase in market value or a restoration to a price which existed on the date of taking over by the executor. (*Matter of Weston, supra*, at p. 509.) That expectation was not, however, realized.

In the case of the Goldman Sachs stock the decline in value was more precipitate. Within the first three months the selling price had been cut to less than half. At the end of six months from the time of the qualification of the executor the price had shrunk to less than one-third of the former value as of the issuance of letters, and that price was practically stabilized up to the last date covered by the account. There is evidence in the case of a similar investigation by the officers of the executor and by its committees of this stock and of the current examination of its reports and balance sheets. Similarly with respect to that stock the basis for a surcharge has not been established by the proofs.

It has not been established that the executor neglected the duty

with which he was charged. It was part of that duty "to form a judgment as to the proper time to dispose of the securities," and if it delayed too long "it was due to an honest error of judgment, and to circumstances which no man could have foreseen." (*Matter of Varet, supra*, at p. 448.) It was further stated in that case by the Appellate Division, First Department, that if the executor acts in good faith and exercises his best judgment "he will not ordinarily be held personally responsible if it appears, in the light of after events, that he would have displayed better judgment, or have produced a more favorable result, if he had sold earlier."

Under these rules the objections of all the beneficiaries must be overruled for I find that the executor was not guilty of negligence. or lack of prudence or vigilance in the handling of the estate.

One further issue in the case requires consideration. I have found that the objections of all the beneficiaries are without support in the record. However, as to certain of the beneficiaries I also find acquiescence by them in the holding of the General Electric stock by the executor, and in addition an expressed direction to the representatives of the executor that this stock be not sold. I find specifically that the two residuary legatees, Virginia Lowrey Pierson and Juliet Tryon Baggallay not only consented, but requested the retention of this stock with the expectation of taking it over in kind at the completion of administration. They are estopped by their conduct to question the resulting loss either in their status as residuary legatees or as pecuniary legatees. (*Matter of Garvin*, 256 N. Y. 518, modifying 229 App. Div. 803; *Matter of Hall*, 164 N. Y. 196; *Matter of Niles*, 113 id. 547; *Hine* v. *Hine*, 118 App. Div. 585; *Matter of Jarvis*, 110 Misc. 5, 16.) Beneficiaries who direct an executor to hold, in the hope of a rise in value, cannot complain if their expectation is disappointed by a further decline in value. They cannot hold the executor for the loss which they directly compelled.

The result has been unfortunate to all of the persons interested in the estate, but the same hardships have resulted to prudent men and women in the widespread shrinkage of values of the securities held by them. The situation is no different from that considered in other decisions, where the executor acted in good faith and a surcharge was denied. (*Matter of Weston, supra; Matter of Varet, supra; Matter of Pratt*, 143 Misc. 751; *Matter of Chaves*, Id. 868; *Matter of Winburn*, SLATER, S., 140 id. 18; *Matter of Dougherty*, HOWELL, S., Nassau county, filed June 9, 1931, unreported.)

In the light of subsequent events the executor should have sold perhaps in the first few months, perhaps not later than six months. A keen and farsighted executor might have disposed by that time

of sufficient stock to pay the administration expenses and other charges and even general legacies. But the law does not test the conduct by a standard of superlative vigilance or vision. It exacts no rigid formula for action nor does it impose any definite limitation of time for the disposal of securities in such a situation. (*Matter of Weston, supra*, at p. 510.) The special circumstances of each estate must be considered. The question, therefore, is not one of the mere arithmetical computation of a period of a year, or of eighteen months. (*Matter of Varet*, 181 App. Div. 446; affd., 224 N. Y. 573.) In view of the general rule that the particular circumstances must be inquired into, it is unnecessary to discuss at length the contention of counsel for certain of the objectants that the sale should have taken place before the expiration of the new statutory seven months period for the filing of an account. It should be noted, however, that the amendments to the Surrogate's Court Act, which reduced the time when an accounting may be compelled or filed voluntarily, from one year to seven months, applied only to the estates of decedents dying after the date when the amendment took effect on April 21, 1931 (Laws of 1931, chap. 562, § 10). The decedent here died prior to that date.

The objections to the retention of the securities are overruled.

Unless the parties will consent to the filing of a supplemental account with opportunity to file additional objections after service of a supplemental citation, the decree may be submitted settling the account as filed in accordance with this decision.

The personal claim of the executor for moneys loaned to the decedent upon her notes has been established in the sum of $30,500 and will be allowed, with interest.

The objection to the failure to secure the benefit of the statutory five per cent discount upon the payment of the transfer tax is overruled. (*Matter of Burroughs*, 137 Misc. 844.)

Submit decree on notice in accordance with this decision and the rulings of the surrogate on the other objections during the trial of the proceeding.