In the Matter of the Accounting of GUARANTY TRUST COMPANY OF NEW YORK, as Surviving Executor of THOMAS F. RYAN, Deceased.

Surrogate's Court, New York County, June 21, 1945.

*Theodore Kiendl*, *William J. Killea* and *Laurence D. Kieran* for Guaranty Trust Company of New York, petitioner.

*John A. Wilson* and *Edgar M. Church, Jr.*, for Nina R. Carroll and others, respondents.

*Tibbetts, Lewis, Lazo & Welch* for Miriam R. Barkley and others, respondents.

*Chadbourne, Wallace, Parke & Whiteside* for George F. Ryan, respondent.

*Sullivan & Cromwell* for John B. Ryan, Jr., respondent.

*Root, Clark, Buckner & Ballantine* for George E. Cleary and another, as executors of Clendenin J. Ryan, deceased, respondents.

*Charles H. Tuttle*, *Stoddard B. Colby* and *William G. McKnight, Jr.*, for Joseph B. Ryan, respondent.

*Willkie, Owen, Otis, Farr & Gallagher* for Caroline R. Hotchkiss and others, respondents.

*Cravath, Swaine & Moore* for Guaranty Trust Company of New York and another, as executors of John B. Ryan, deceased, respondents.

*Curtis, Mallet-Prevost, Colt & Mosle* for Fortune P. Ryan, respondent.

*Thomas I. Sheridan,* special guardian for William K. Ryan, alleged incompetent, legatee, and for Thomas M. Baring and others, infant remaindermen, respondents.

Foley, S. In this proceeding the remaining executor — the Guaranty Trust Company of New York — seeks the judicial settlement of its account for transactions in the period from May 31, 1938, to and including September 15, 1942.

Mr. Ryan died on November 23, 1928.

There have been four prior accountings of the executors who variously functioned during the period of administration.

Objections have been filed to the pending account by numerous beneficiaries of the estate. These objections are substantially similar in character. For convenience in the consideration and disposition of the issues, the objections filed by one of the beneficiaries, Joseph B. Ryan, have been selected by the Surrogate as typical of the others.

Two principal grounds of attack are directed against the conduct of the executor. In general, it is claimed that the executor, through its officers and employees, sold two groups of securities improvidently and at a price below the fair market value. The first group of securities was those of the Clinchfield Coal Company and of an affiliate corporation. The second was those of the Auto-Ordnance Corporation. Each group had been owned by the testator at the time of his death. The securities might properly be described as slow assets. The stock of the corporations involved was closely held. It is also of significance in the test of the conduct of the executor that both groups were sold by it at a profit over the value at the time the securities were taken over.

The issues are simple. They have been magnified only by reason of the large surcharges demanded against the accounting party. The objectants demand a surcharge of approximately $1,200,000 in the sale of the Clinchfield securities. They also demand a minimum surcharge of approximately $200,000 in the sale of the Auto-Ordnance securities. The total liability asserted is, therefore, approximately $1,400,000.

(1) The first and second objections challenge the conduct of the executor in the sale, for the sum of $529,000, in the month of July, 1939, of 18,505 shares of the stock of Auto-Ordnance Corporation, and of its promissory notes in the face amount of $1,090,000. In the Federal estate tax proceeding these shares

were appraised as of no value and the notes as of the value of about 27% of the face amount. It is charged that the sale was for a grossly inadequate price and far below actual value; that it was made in disregard of the interests of the beneficiaries and without proper and prudent efforts to secure the fair and reasonable value; that it was made without consultation with or notice to the beneficiaries.

It is also claimed that the objectant had demanded of the executor that the securities should not be sold without timely notice to him or that his proportionate interest should be distributed to him in kind and that the sale was made privately and without notice to him.

All these objections are overruled.

The Auto-Ordnance Corporation was organized in 1916. It owned the patents and the rights for the manufacture and sale of the Thompson submachine gun, popularly known as the "Tommy gun." Colonel Thompson, the inventor of the gun, participated actively in the company's management. The testator at the time of incorporation bought 60% of the stock and loaned the corporation large sums of money approximating $1,300,000, evidenced by its notes in its early operations. Colonel Thompson and his associates owned the minority of the stock. The corporation owned no plant. The first extensive manufacture of the Thompson gun was made on order of the Auto-Ordnance Corporation, in 1921, by the Colt's Patent Fire Arms Manufacturing Company. Fifteen thousand guns and certain spare parts were delivered under that order. No additional guns were manufactured until after the signing of the agreement of sale here involved. During the succeeding years after 1921 the guns were sold at a comparatively slow rate. At the end of 1938, about seven months before the securities here involved were sold, approximately 5,000 guns remained on hand.

The securities had been held for several years by the executor to await an adequate offer of purchase. On March 21, 1939, the executor entered into a contract with the intended purchaser. There were supplemental and collateral agreements made between the parties within the next few days. For convenience this group of papers is hereinafter referred to as the agreement of sale.

I find upon the evidence that the price was adequate and represented the then fair and reasonable market value and that the executor acted under the rules of conduct which were set forth in *Matter of Clark* (257 N. Y. 132).

In my recent decision in *Matter of Bunker* (184 Misc. 316, 319) these rules were summarized as follows: "The tests of the

conduct of a fiduciary were restated in the leading case of *Matter of Clark* (257 N. Y. 132, 136, 137). They are there set forth as follows: 'In determining whether the acts of a trustee have been prudent, within the meaning of the rule, we must " look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place " (* * * *Purdy* v. *Lynch,* 145 N. Y. 462, 475); for it is an obvious truth that " a wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by " (* * * *Costello* v. *Costello,* [209 N. Y. 252], *supra,* at p. 262); and it is impossible to say that trustees are wanting in sound discretion " simply because their judgment turned out wrong " (* * * *Green* v. *Crapo,* 181 Mass. 55, 58). * * * Furthermore, the distinction between negligence and mere error of judgment must be borne in mind. " Trustees acting honestly, with ordinary prudence and within the limits of their trust, are not liable for mere errors of judgment " (* * * *Matter of Chapman,* [(1896) 2 Ch. 763], *supra,* at p. 776); a trustee should not be held liable " for unfortunate results which he could not be expected to foresee and was powerless to prevent " (*Ormiston* v. *Olcott,* 84 N. Y. 339, at p. 347).' "

I also cited recent decisions which have dealt with the rule of current prudence and vigilance, where a surcharge was denied. They are *Matter of Delamater* (266 App. Div. 200, affd. 292 N. Y. 518), *Chemical Bank & Trust Co.* v. *Ott* (274 N. Y. 572, modfg. 248 App. Div. 406) and *Matter of Kent* (146 Misc. 155, affd. 246 App. Div. 604, leave to appeal denied, 270 N. Y. 675).

The objectants would fasten a surcharge upon the executor because of the failure of its officers and employees in March, 1939, to anticipate an increase in the sale of the number of guns to the United States Government by reason of succeeding events. They say that the executor should have known that the war between Germany, Poland, England and France would break out in September of 1939, and that the United States, in the succeeding year, would begin its more active preparation for our entry into the war. They say that the executor should have anticipated Pearl Harbor, in December, 1941, and our immediate declaration thereafter of war against Japan and Germany. The law is not so exacting as to require divine prescience and foresight.

To repeat the quotation from *Purdy* v. *Lynch* (145 N. Y. 462, 475–476, *supra*) in determining whether the acts of a trustee have been prudent, within the meaning of the rule " we are to

look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place * * * " and the quotation from *Costello* v. *Costello* (209 N. Y. 252, 262, *supra*), that it is an obvious truth that a "wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by."

In the pending estate, under neither any principle of law nor any provision of the will was the executor required to obtain the consent or even the advice of a beneficiary to a proposed sale. Neither the objectant, Joseph B. Ryan, nor any other beneficiary had the right to demand a distribution of an asset in kind. (Surrogate's Ct. Act, § 268.)

It is claimed firstly that the agreement of sale constituted a mere option. It is claimed secondly that between the date of the making of the agreement of sale and its consummation, a change of circumstances occurred which should have persuaded the executor to cancel the contract. An analysis of the contents of the agreement of sale does not support either of those contentions.

The Surrogate holds that the agreement of sale was a valid and bilateral contract and not an option. The difference in the nature of these separate forms of obligations was stated by the Court of Appeals in *Benedict* v. *Pincus* (191 N. Y. 377).

The second contention of the objectants here is that the executor, because of an order for new business from the United States Army between the date of the original agreement of sale and the date of its consummation, should have resorted to any possible expediency or technicality to void the contract. Actually no legal or factual ground for the cancellation of the agreement of sale ever existed. The officers of the executor during this period were advised by a firm of competent and experienced attorneys as to the binding effect of the agreement of sale and their duty to complete it by the acceptance of the stipulated sale price. These attorneys were not the regular attorneys for the executor. They had specialized experience because of their representation of Mr. Ryan in his lifetime and their familiarity with the financial and legal affairs of the estate and particularly of Auto-Ordnance Corporation over a period of several years.

Typical of the technicalities to which it is claimed the officers of the executor should have resorted is that the agreement of sale could have been cancelled by the failure of the purchaser to pay the sale price of $529,000 in money or certified check, instead of the form of payment actually made, which was a treasurer's check of a solvent bank in this city. The proceeds

of this check were promptly collected by the executor in the regular course of business. Under the special circumstances of the consummation of the sale after banking hours, no ground for the rejection by the executor of the tender of the treasurer's check was justified. The opinion of Mr. Justice HOLMES in *Simmons* v. *Swan* (275 U. S. 113), where substantially similar facts were involved, amply supports the conduct of the executor in this transaction. There the purchaser tendered a certificate of deposit upon a solvent bank for the required part of the selling price. The seller rejected the offer. The seller then departed from the conference. It was pointed out by Mr. Justice HOLMES (p. 116) that if the seller after banking hours had insisted upon legal tender, the purchaser "was entitled to a reasonable opportunity to get legal tender notes," and that as it was too late to get them on the evening of the closing of the transaction he might have tendered them on the next day. There, the contract was for the purchase of a pickle factory. The price of pickles advanced between the date of the contract and the date set for closing. The seller was desirous of resorting to any device to escape from his contract. Similarly, here, if the executor had rejected the treasurer's check, the purchaser would have been at liberty to present a certified check or currency on the next banking date, which was July 24, 1939. If the course suggested by the objectants had been followed by the officers of the executor and performance of the agreement of sale refused on this flimsy ground, a successful lawsuit on the part of the purchaser would inevitably have resulted, with needless and burdensome damages and expense imposed upon the beneficiaries.

It is further contended that the executor could have cancelled the contract or withheld its completion by insisting that its final approval or disapproval should have been made by the order of the Surrogate. Upon this question, whatever may be the law of other States, referred to in the decisions cited by the objectants in support of their position, it is not the law of New York. The executor here had a broad power of sale under the will. Even aside from this authority it had a free and uncontrolled right to sell the securities under ordinary rules for the administration and liquidation of estate assets. It has been the policy of the Surrogates' Courts not to encourage applications for the sale of assets by fiduciaries. (*Matter of Pulitzer*, 139 Misc. 575, affd. 237 App. Div. 808.) It is in exceptional cases only, principally in disputes between fiduciaries, where applications authorizing the sale of property are entertained. The general policy of encouraging the independent exercise of the business

judgment and discretion of a fiduciary has been based upon his responsibility under the testator's selection to discharge the duty placed upon him by law or by the terms of the will.

The Surrogate sustains the contention of counsel for the executor that the disapproval of the Securities and Exchange Commission of the plan of the purchaser for the public sale of the stock did not furnish ground for the cancellation of the agreement of sale by the executor in the period between the middle of June and the closing of the contract on July 21, 1939. The terms of the agreement of sale clearly provided for the alternative right in the purchaser whereby it could enforce the delivery of the securities by the payment of the purchase price without regard to the disapproval of the registration by the Securities and Exchange Commission.

Finally, upon this phase of the proceeding the Surrogate finds that the officers of the executor acted in the best of faith and with the highest sense of fidelity to the beneficiaries. They proceeded in the exercise of judgment, prudence and vigilance. (*Matter of Clark,* 257 N. Y. 132, *supra.*) Not the slightest evidence of self-dealing, negligence, imprudence, improvidence or other ground of surcharge has been shown. All these objections are overruled in their entirety.

(2) A second group of objections has been filed to the sale of 53,817 shares of stock of the Clinchfield Coal Company and 1,500 shares of the Clinchfield Fuel Company, and to certain expenses incidental to the sale. It is claimed in general that the sale was improvident and below the fair market value. It took place in August, 1942. The selling price of the Clinchfield Coal Company's stock was $269,085. That of the Clinchfield Fuel Company's stock was $1,500.

The Surrogate finds upon the evidence that the sale of these securities was prudently made in the exercise of judgment and for a fair and adequate price.

The stock of Clinchfield Coal Company was sold by the executor at $5 a share. An expert called by certain of the objectants testified that the value at the time of sale was $27 a share. The difference between these two amounts measures the demand for a surcharge of approximately $1,200,000. The Surrogate rejects the opinion of value expressed by this expert. Of his estimate he allocated $12 as the value of the shares of stock in relation to coal properties actually operated by the company and the sum of $15 a share as the additional item of value of the undeveloped coal properties. These estimates were in great part based upon earnings from prospective operations. The executor was con-

fronted with an opportunity to sell a large block of the stock representing a minority interest of 37% of the total issue of common stock of the company. It would not have been possible to have sold this large block on the exchange on which the stock was listed. The sale was made, as generally happens in such cases, to those persons holding the majority control. No dividends had been paid upon the stock for a period of sixteen years. During that period its financial operations had resulted in an accumulated deficit in a sum exceeding $2,000,000. Moreover, the stock had been traded in, somewhat inactively, on the New York Curb Exchange. Except for the sale of an inconsequential number of shares the selling prices on that exchange during the period of this account were less than the $5 a share actually realized by the executor under its sale. The opinion of the expert for the objectants as to the additional value of $15 a share attributed to the undeveloped coal properties is highly theoretical and might be properly characterized as a blueprint appraisal. The company owned approximately 200,000 acres, consisting in part of coal lands within the so-called "Clintwood Seam" in southwest Virginia. The expert testified that the coal in it was high-grade bituminous. No part of this area had been operated by the company. The expert's opinion of value, however, must be rejected because of his own admissions as to the excessive cost required to put these properties into production. He testified that the cost of new plants and mining equipment for the development of the area would be $6,000,000.

Certainly, with the company's accumulated losses in operation and the fact that no dividends were paid on the common stock, the executor would not have been justified in advancing estate funds to contribute to the cost of this new development in a purely speculative venture. Moreover, with the unsatisfactory financial condition and almost continuous annual losses the company would not have been able to borrow new money from outside sources. For a period of sixteen years annual losses were incurred except that in three years relatively small profits were earned.

More important is the fact that the area containing the "Clintwood Seam" coal was far removed from any railroad. We must assume from the standpoint of good business sense that even before a plan for mining the coal in the area had been actually started, transportation facilities would have to be arranged to market the coal. The nearest railroad would have required an extension of fourteen miles to reach the area of mining. Another railroad would require an extension of thirty

miles. The expert estimated that the cost of these extensions would range from $3,500,000 to $6,000,000. Whether either railroad would undertake these large expenditures was not shown but remained in the realm of theory. In any event, the entire cost of equipment for mining and railroad facilities would have ranged, under the estimates, between $9,500,000 and $12,000,000. As against the hypothetical opinions of value of this expert the Surrogate accepts the evidence submitted by the executor that the actual price of sale represented the fair and reasonable value of the stock.

The officers of the executor exercised sound business judgment in selling these unproductive assets at the best price obtainable and under the first firm and reasonable offer of purchase received. Thereby they discharged their duty to the life tenants to obtain cash for reinvestment which would be productive of income. (Restatement, Trusts, § 181; 2 Scott on Trusts, § 181, p. 966.)

Again, the application of the rules in *Matter of Clark* (257 N. Y. 132, *supra*), and in the other cases cited above, requires an exoneration of any surcharge against the executor. No negligence, self-dealing or disloyalty to the interests of the beneficiaries or other ground of surcharge has been established.

One of these objections involves the payment to a broker of a commission for his services in the sale of the securities. The Surrogate finds that he procured the ultimate purchasers and that the compensation paid to him was fair and reasonable.

All of the objections on this phase of the proceeding are overruled.

(3) The objections filed by the beneficiary, John Barry Ryan, Jr., to the sale of the stock of the British American Tobacco Company, Ltd., have been withdrawn by written stipulation approved by the Surrogate.

(4) The demand set forth in certain of the objections for the denial of commissions to the executor is overruled. Not the slightest evidence of any ground of misconduct has been shown. Commissions are, therefore, allowed.

Submit decree on notice settling the account accordingly.