In the Matter of the Accounting of BANKERS TRUST COMPANY OF ROCHESTER, as Trustee under a Unitrust Agreement and for the Benefit of PHILIP Y. HAHN, Deceased. BANKERS TRUST COMPANY OF WESTERN NEW YORK, Appellant; PHILIP Y. HAHN FOUNDATION et al., Respondents.

Fourth Department, May 25, 1983

APPEARANCES OF COUNSEL

*White & Case* (*Laura Hoguet* and *E. Bayard Halsted* of counsel), for appellant.

*McHugh & Burke* (*Robert J. Burke* of counsel), for Philip Y. Hahn Foundation, respondent.

*Phillips, Lytle, Hitchcock, Blaine & Huber* (*Paul Zuydhoek* and *Arthur M. Sherwood* of counsel), for the Estate of Philip Y. Hahn, respondent.

*Sullivan, Johnson, Peters, Burns, Adams & Mullin, P. C.* (*Michael Law* of counsel), for the Estate of Muriel Hahn, respondent.

*Robert Abrams, Attorney-General (Bernard E. Toomin, Jonathan J. Silbermann* and *Jennifer K. David* of counsel), for ultimate charitable beneficiaries.

OPINION OF THE COURT

*Per Curiam.*

In a proceeding brought by the trustee for approval of its intermediate accounting, Trial Term has sustained certain of respondents' objections and surcharged the trustee in the amount of $840,737.02 with interest. The trustee appeals only from that portion of the judgment imposing the surcharge, together with interest and costs. We reverse and dismiss the objections.

The trust in question, the Philip Y. Hahn Unitrust (a charitable remainder trust set up pursuant to US Code, tit 26, §§ 664, 2055, subd [e]) was funded with 225,000 shares of Coleman Company common stock donated to it by Philip Y. Hahn. The trust instrument, which grants the trustee absolute discretion in investing trust assets, contains no directions, either precatory or mandatory, concerning the disposition of the Coleman securities. The 225,000 Coleman shares were not registered under the Securities Act of 1933 (US Code, tit 15, § 77a *et seq.*) and were a portion of a block of the stock received by Mr. Hahn as the result of a merger of Coleman Company and Crossman Arms Company, Inc., of which he was principal owner.

Pursuant to the merger agreement and applicable Federal securities laws, absent an agreement by Coleman Company to the removal of the restrictions on the shares, the trustee was prohibited from selling the shares for a period of three years from the date of the merger except pursuant to one of the three methods permitted by rule 133 of the Securities and Exchange Commission (SEC) (17 CFR 230.133). The objections made to the accounting pertain to sale of these restricted shares by the trustee pursuant to one of the methods allowed by rule 133 — the so-called "dribble sale" method under which limited amounts of the stock were permitted to be sold at intervals of not less than six months commencing six months after the merger date. Pursuant to rule 133, the number of shares permitted to be

sold at each six-month interval, or "window date", was limited to the lesser of (i) 1% of the total number of Coleman shares then outstanding; or (ii) the largest aggregate reported weekly trading volume of Coleman shares on the American Stock Exchange during any single week within the four preceding weeks.

Although the first dribble sale would have been permitted on February 22, 1972, six months after the merger, it did not take place until March 30, 1972. A second dribble sale was permissible on September 30, 1972, after the passage of another six-month interval. The trustee, however, did not make the second dribble sale until November 30, 1972. The price at which the Coleman shares were sold on November 30, 1972 ($35 per share) was higher than the price on September 30, 1972 ($32.25 per share). The weekly trading volume, however, during the four weeks preceding the sale on November 30, was less than the trading volume in the weeks preceding September 30, 1972. As a result, the number of shares that could be sold on November 30, 1972 (42,400) was less than the number that could have been sold had the sale occurred on or shortly after September 30, 1972 (65,300). Thereafter, in 1973 the price of Coleman Company shares declined sharply, due, in large measure, to the OPEC oil embargo. The Coleman shares remaining in the trust were ultimately purchased from the trust by the Coleman Company in 1974 at $5.25 per share.

Trial court found that the trust had lost $501,700 as a result of the delay in effecting the second dribble sale computed in the following manner: "I find that the trustee could have sold 65,300 shares of Coleman during the week ending October 6, 1972 at an average price of 32¼ * * * When the sale was actually made on November 30, 1972, 42,400 shares were sold at an average selling price of $35 a share. Had the trustee sold the 65,300 shares at an average price of 32¼ during the first week of October, 1972, the Unitrust would have realized approximately $2,105,925.00. The sale in November of 1972 of 42,400 shares at $35.00 amounts to $1,484,000.00. Accordingly, the failure to sell during the first week of October, 1972 resulted in a difference in amount realized of $629,912.00.

The 22,900 shares (62,300 less 42,400) were eventually sold in December, 1974 for $5.25 a share or $120,225.00. Crediting that amount to the trustee, the assessable loss to the Unitrust is $501,700.00." To this figure it added interest as computed and deducted certain credits for dividends making the total amount surcharged $840,737.02.

The delay which produced the loss, the court concluded, had resulted from two factors: (1) the trustee's negligence in failing to monitor or give attention to the window dates and (2) the trustee's negligence in ignoring the sales volume in Coleman shares or failing to understand how the volume during the period preceding the date of a dribble sale could affect the number of shares permitted to be sold in that sale under rule 133. We reject each of these conclusions.

The trustee's duty is to exercise that degree of care which "prudent men of discretion and intelligence in such matters, employ in their own like affairs" (*King v Talbot,* 40 NY 76, 86, quoted in *Matter of Bank of N. Y.,* 35 NY2d 512, 518-519, and *Matter of Clark,* 257 NY 132, 136). To warrant a surcharge, the objectors must show that the trust's losses resulted from the trustee's negligence or failure to exercise such prudence (see *Matter of Bank of N. Y., supra,* p 519; see, also, *Matter of Clark, supra,* p 137). In determining whether to impose a surcharge a court must " 'look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place' " (*Matter of Clark, supra,* p 136, quoting *Purdy v Lynch,* 145 NY 462, 475-476; see *Matter of Bank of N. Y., supra,* p 519). We note also that retention of securities received from the creator of the trust may be found to be prudent even when purchase of the same securities might not (see *Matter of Clark, supra,* pp 136-137; *Stark v United States Trust Co. of N. Y.,* 445 F Supp 670, 679).

The record does not support the court's finding that the delay in the second dribble sale was a consequence of the trustee's inattention to the window dates; i.e., that had it properly monitored the window dates, it would have decided to make the second sale on or shortly after September 30, 1972. On the contrary, the evidence compels the conclusion that the trustee was aware of the window dates and

that the decision to postpone the sale was based on a judgment that the price of the stock would go up, as it did. Moreover, the court's conclusion that the delay and consequent loss were due in part to inattention to the window dates appears to be premised on an assumption that the trustee was under a legal duty or a duty resulting from some self-imposed plan to sell the Coleman shares at the earliest time permitted. We find nothing in the record to support such assumption. From the fact that the trustee had determined that selling the Coleman Company shares would be desirable for the purpose of obtaining diversification in the portfolio, it does not follow that the trustee had the duty to sell those shares at the first opportunity if the conditions of the market and price of the stock indicated that it would be better to wait. That the trustee had no established policy of selling at the earliest possible date is evidenced by the fact that although the first dribble sale could have taken place on February 22, 1972, it did not make the sale until five weeks later. Nor is there sufficient evidence to support a determination that in the light of what was apparently a depressed market price on September 30, 1972, it was imprudent for the trustee not to sell at that time or during the succeeding two months.

We must also reject the court's conclusion that the trustee's decision not to sell on or shortly after September 30, 1972 "based solely upon price and with consideration to volume solely as an afterthought, was not based upon factors which the prudent man standard requires." There is no contention that from the knowledge of what the sales volume had been during the four weeks preceding September 30, 1972, the trustee would have been able to predict what the volume would be in the weeks following that date. Nor is there any showing of how information about sales volume prior to September 30, 1972 would or should have affected the trustee's decision. Thus, even if the trustee did not monitor sales volume and may have been remiss in misunderstanding the method of computing the number of shares to be sold under rule 133, it does not appear that there is any causal connection between such conduct and the postponement of the sale and consequent loss. For this reason, these alleged failures of the trustee

cannot be a basis for the surcharge (see *Matter of Bank of N. Y.*, 35 NY2d 512, 519, *supra*). Moreover, we find that it was not imprudent for the trustee to base its decision on price, a variable about which it had some basis for making predictions, without regard to volume, a variable whose movement was random and unpredictable.

Accordingly, the judgment insofar as appealed from should be reversed and the objections dismissed.

HANCOCK, JR., J. P., DOERR, DENMAN, MOULE and SCHNEPP, JJ., concur.

Judgment insofar as appealed from unanimously reversed, on the law and facts, with costs to petitioner, and objections to petitioner's accounting dismissed.