OPINION OF THE COURT
Edmund A. Calvaruso, S.
Holding
Objectant, Gilbert Stone, seeks to surcharge executor Michael Duffy for losses incurred by the estate during the post-September 11, 2001 stock market decline. The court holds that the executor made a prima facie showing that the estate’s investment plan was in compliance with the Prudent Investor Act, and objectant failed to meet his burden to show both that the investments were imprudent and that the losses experienced by the estate were due to any negligence on behalf of the executor.
Background
Decedent died on July 19, 2001, survived by her husband, Gilbert Stone, 38 years her junior, and her sole distributee. Her *903 last will and testament, dated April 11, 2000, bequeathed almost her entire estate (but for $8,000), to Stone. Michael Duffy, decedent’s friend and long time attorney, was the nominated executor and letters testamentary were issued to him on August 6, 2001.
Decedent’s estate was comprised of 38 $1,000 bonds, a house valued at $78,000 and an investment portfolio with a date of death value of $619,417.96. The house and most of the portfolio were distributed in kind to Stone. The stock was transferred to him on October 7, 2002. The accounting shows a realized loss of $226,749.97, representing the difference between the portfolio’s value at the date of death and its value on the date Duffy transferred it to Stone.
On January 20, 2004, Duffy filed a petition for judicial settlement of his account. Objections were filed by Stone on March 29, 2004, seeking to surcharge Duffy for the loss suffered by the estate, as well as denial of commissions and legal fees. The matter proceeded through litigation, including an appeal of this court’s decision on a summary judgment motion. Settlement negotiations remained stagnant. A bench trial was held on June 2, 3 and 4, 2009.
Positions
Stone maintains that Duffy handled this estate negligently from the beginning. He argues that Duffy had no investment plan, had no meaningful discussions with an investment advisor as to the investment of the estate assets, had few discussions with himself as to the progress and investment of the estate, kept the vast majority of the estate invested in a portfolio wherein 75% of the value was comprised of only six stocks, and ignored the estate for months while the corpus suffered a 40% loss. Stone argues that Duffy should have converted the estate assets to cash immediately, and because he did not do so, he should be surcharged for the loss. Stone also argues that Duffy’s negligence also should deprive him of commissions and legal fees.
Duffy has filed his accounting, and maintains that he has acted with all requisite prudence in managing this estate. He argues that the stocks had been invested by the decedent with Stone’s much longer life expectancy in mind, and that it was his plan to continue her plan of investment and distribute the stocks in kind to the beneficiary, once the estate administration was completed. He maintains that the portfolio was diversified, *904 and in accordance with the requirements of the Prudent Investor Act. He argues that he should not be surcharged nor lose his commissions, and that his request for legal fees is supported based upon a calculation referencing the size of the estate, and that his fees are in accordance with local custom.
Opinion
Investment Loss
Fiduciaries will not be held responsible for investment losses unless the loss was due to fiduciary negligence. Fiduciaries are not to be “insurers or guarantors” (Matter of Cuddeback, 168 Misc 698, 698 [1938]); they are not to be surcharged for losses stemming from unforeseeable events. (Matter of Bunker, 184 Misc 316 [1944]; Matter of Newhoff, 107 Misc 2d 589 [1980].) Because the standard of prudence looks to the fiduciary’s actions, good faith is paramount, and mere errors in judgment will be free from surcharge: “[T]he distinction between negligence and mere error of judgment must be borne in mind. ‘Trustees acting honestly, with ordinary prudence and within the limits of their trust, are not liable for mere errors of judgment.’ ” (Matter of Clark, 257 NY 132, 137 [1931]; see also Matter of Bunker, supra; Matter of Cuddeback, supra; Matter of Kilmer, 18 Misc 2d 60 [1959].) Objectant must prove that the losses resulted from the trustee’s negligence or failure to exercise “that degree of care which ‘prudent men of discretion and intelligence in such matters, employ in their own like affairs.’ ” (Matter of Hahn, 93 AD2d 583, 586 [1983].) As the Hahn case holds, the proof elements of fiduciary investment liability are similar to a simple tort case. Wherein an objectant pleads that a fiduciary negligently managed the corpus, the fiduciary can be surcharged to offset the objectant’s loss, provided that the objectant has proved the necessary elements of investment negligence: a breach of duty causing a loss to the beneficiary. In an accounting proceeding, the fiduciary has the primary burden to establish an account of his or her activities. This burden is met by the submission of a prima facie accounting, at which point the burden shifts to the objectant to prove that the accounting is somehow insufficient. (Matter of Schnare, 191 AD2d 859 [1993].) Proof of investment negligence is therefore objectant’s burden to bear. (Matter of Cuddeback, 168 Misc 698 [1938].)
*905 Duty
The Prudent Investor Act, EPTL 11-2.3, guides investment decisions of fiduciaries made after January 1, 1995. It will set the standard for duty with regard to the fiduciary’s investment decisions in this case. There are four primary requirements for the fiduciary’s “prudent investor standard” in EPTL 11-2.3 (b) (3).
First, the fiduciary must decide within a reasonable amount of time, whether to “retain or dispose of initial assets.” (EPTL 11-2.3 [b] [3] [D].) Second, the fiduciary must follow an investment strategy in accordance with the need to make distributions and the balance between risk and rate of return. (EPTL 11-2.3 [b] [3] [A].) Third, as a part of developing this investment strategy, the fiduciary must consider various factors, including: size of portfolio, nature and duration of fiduciary relationship, liquidity of estate and distribution requirements, general economic conditions, inflation/deflation, tax consequences, role of each investment within the portfolio, expected total return, and the needs of beneficiaries (to extent reasonably known by the fiduciary). (EPTL 11-2.3 [b] [3] [B].)
Lastly, the Prudent Investor Act requires diversification as a default provision, though the fiduciary can elect not to diversify, if he or she “reasonably determines that it is in the interests of the beneficiaries not to diversify.” (EPTL 11-2.3 [b] [3] [C].) The statute does not, however, define “diversify.”
Breach
Duffy’s proof specifically addressed the components of the Prudent Investor Act. His argument spells out why he believes that his actions were in compliance with the law. He testified that he made a plan shortly after letters were issued: to distribute the stock in kind to Stone. Decedent’s will did not restrict his investment decisions, but the stocks which were in her estate were stocks she had owned, as invested, for years. Stocks owned by the decedent undergo a somewhat softer analysis: retention of a portfolio owned by decedent may be prudent even where the independent purchase of the same stocks by the fiduciary may not. (Matter of Hahn, 93 AD2d 583, 586 [1983], citing Matter of Clark, 257 NY 132, 136-137 [1931]; Matter of Kent, 146 Misc 155 [1932].) Stone, being considerably younger than his wife, was the measuring life for the investment horizon, and the stocks were kept as invested given Stone’s age and Duffy’s plan to distribute them in kind. The portfolio had met the income needs of Stone and the decedent for years prior to decedent’s
*906 death. The portfolio itself was a varied mixture of stocks, but 75% of the corpus’s value was comprised of stock from only six companies. Duffy argues that the portfolio was diversified, just aggressively invested, and not imprudent under the circumstances. Stone offered proof to suggest that the portfolio was not properly diversified without an inclusion of conservative investments, such as cash. However, Duffy countered this by showing that there were other assets present in the estate, and when the estate as a whole was reviewed, the asset mix was much broader. Duffy argued that during the time of his estate administration, the market was undergoing a lengthy and steep decline, partially due to two large external events which happened during this time, both unforeseeable and both having consequences which became difficult for investors to navigate. Fiduciaries holding stocks in times of economic stress and falling markets are to be shown “leniency.” (Matter of Newhoff, 107 Misc 2d 589, 592 [1980]; Matter of Cuddeback, 168 Misc 698 [1938].) The court holds that under the totality of the circumstances, Duffy has put forth a prima facie accounting as well as prima facie evidence of compliance with the Prudent Investor Act.
Stone argues that Duffy performed little to no analysis as to the investments, communicated rarely, if ever, with Stone, and. continued to ignore the portfolio even after the stock market decreased drastically during his tenure. Stone argues that the portfolio was improperly invested for a short-term time horizon, which was the proper length of time for the fiduciary to consider. He argues that Duffy’s nonfeasance caused a drastic loss to the estate for which he should be surcharged.
Duffy is not excused from the demonstrated lack of communication with Stone, though this complaint would appear to be a complaint against bad practice rather than imprudence under the Prudent Investor Act. Where a fiduciary has decided to retain an aggressively held portfolio for an in-kind distribution to a beneficiary, the fiduciary should want to ensure that adequate communication with the ultimate beneficiary is achieved. Here, though the evidence showed that communications were infrequent and eventually antagonistic, Stone was aware of Duffy’s initial plan and had no apparent objection to it until after the market began a decline. Nor did Stone take it upon himself to solicit any additional communications with Duffy or make any requests for liquidation. See Matter of Clark, where the beneficiaries did not communicate to the fiduciary *907 any desire for him to sell the stock, which was a consideration leading to the ultimate holding that the fiduciary was not liable. (257 NY 132 [1931].)
With respect to the work performed by Duffy in evaluating the portfolio and other factors and developing an investment strategy, it is not clear how much consideration he gave to other investment strategies besides retention plus in-kind distribution. Though this court has found prima facie evidence of compliance with the Prudent Investor Act, it strongly cautions that there is a critical line between (a) deciding upon retention after considering all facts and circumstances according to the statute, and (b) merely doing nothing with respect to the assets at issue. Fiduciaries must remain “actively vigilant” in their evaluation of the investments. (In re First Natl. Bank of City of New York, 25 NYS2d 221, 225 [1941].) A fiduciary’s conduct is the relevant inquiry, and as long as it is within “substantial compliance” (EPTL 11-2.3 [b] [1]) with the prudent investor standard, liability will be prevented. Duffy’s evidence supporting his decades-old friendship and professional relationship with the decedent and his thorough knowledge of her finances, coupled with his decision to continue what he believed to be her goal to retain and eventually distribute in kind the stocks for the benefit of Stone, and his discussions of the stocks with a broker once the market suffered a significant loss, is sufficient to show “substantial compliance”; and, thus, that his actions fell on the nonliability side of that line.
Stone’s primary theory of the case for liability was that Duffy breached the duty set forth by the Prudent Investor Act because rather than retaining the stocks, he should have (a) sold the stocks “immediately,” and (b) converted them to cash and kept them as such until the estate was closed. This line of reasoning comprised his entire case. It hinged upon the testimony of Duffy himself, plus an expert witness who by profession was a certified financial planner. Stone’s expert witness testified that cash was the proper method of investment for short-term investment horizons, defined as 18 months or less. Stone’s expert further testified that since an estate, by its nature, is a short-term investment, short-term investment recommendations should be applied to corpus management in estates.
Stone is correct that fiduciary investment decisions are supposed to take into account the length of time that the entity (the “estimated duration of the fiduciary relationship” [EPTL 11-2.3 (b) (3) (B)]) will exist. On uncomplicated estates, this *908 would suggest that, generally speaking, a more conservative approach to holding funds is warranted. Time horizon, however, is not the only factor which the Prudent Investor Act references for the fiduciary to consider. Stone’s theory of the case seeks to place time horizon at the forefront of a fiduciary’s considerations, to the near exclusion of the rest of the factors listed in the statute. The court does not believe that such a holding would comport with the intent of the statute. This is especially true considering that the Prudent Investor Act specifies for the first time that diversification of investments is to be the default for fiduciaries (EPTL 11-2.3 [b] [3] [C]) and Stone is actually arguing here that prudence required the opposite: an all cash portfolio. If the court were to adopt Stone’s approach, it would risk setting precedent under the Prudent Investor Act that uncomplicated estates should be liquidated and placed into cash accounts, a precedent which seems at odds with the intent of the statute as well as- sanctioned practice. (Matter of Buck, 184 Misc 29 [1944].) Indeed, in times of rising markets, fiduciaries have been held liable when estate funds were invested too conservatively and provided no return. (Matter of Newswander, 15 Misc 2d 148 [1958].) While the conversion to cash might be good practice in many estates, the court does not interpret the Prudent Investor Act to impart such a potentially unyielding requirement on all estates.
Furthermore, the court finds that Stone’s assertion that Duffy should have sold the stocks “immediately” is against the weight of the evidence. Duffy’s expert witness, an attorney with considerable experience in representing fiduciaries of estates, testified that it would not be prudent to sell estate assets before at least the passage of two to four months. As he testified, this time is needed to ascertain the size of the estate and its liabilities, among other considerations. Neither Stone nor his expert ever defined “immediately,” so the court must define it as meaning nothing other than the day that letters testamentary were issued to Mr. Duffy, the soonest Duffy had the power to sell. The court finds this assertion to be inherently unreasonable, an unrealistic expectation of fiduciaries. In older cases, 12 to 18 months was seen as a reasonable time period to liquidate stock. (Matter of Cuddeback, 168 Misc 698 [1938]; Matter of Kent, 146 Misc 155 [1932]; Matter of Buck, 184 Misc 29 [1944] [though parenthetically, this court believes such a time line would be too long in many modern circumstances].) Furthermore, the Fourth Department in Matter of Hahn held that there
*909 is no duty to sell as soon as possible (93 AD2d 583 [1983]). Stocks should not be negligently retained, but nor should they be sold rashly. (Matter of Clark, 257 NY 132 [1931].) A delay in sale in and of itself will not equate to liability: “[the fiduciary] will not ordinarily be held personally responsible if it appears, in the light of after events, that he would have displayed better judgment, or have produced a more favorable result, if he had sold earlier.” (Matter of Kent, 146 Misc 155, 161 [1932].)
Stone’s expert lacked credibility because he sought to apply his idea of prudent liquidation time lines for brokers and financial planners to an estate relationship. Duffy’s expert, on the other hand, was addressing prudence solely with respect to estate administration, and as such his testimony is more relevant and due more weight. Finally, Stone’s witness was a poor witness overall. Through much of his testimony he was evasive, vague or nonresponsive. Accordingly, the court disregards his testimony. Without the critical evidence from his expert, Stone’s entire theory of the case becomes unsupported.
In the alternative that his “immediate conversion to cash” theory was rejected, Stone has asked for the Surrogate to select a reasonable date by which Duffy ought to have liquidated the portfolio. Though the Appellate Division overturned a sua sponte date selection in a prior fiduciary liability case (Matter of Chase Manhattan Bank, 26 AD3d 824 [2006]), Stone has argued that this holding does not apply here because he has specifically not pleaded a date at all, consenting to allow the Surrogate to select one. The court does not adopt this argument. The Appellate Division’s holding in Matter of Chase Manhattan Bank was based upon concern of fairness toward the defending fiduciary, and as such, its requirement is not one which an objectant can waive.
Even if the court believed that the procedural holding in Matter of Chase Manhattan Bank should be reconsidered, given the powers of the Surrogate discussed in Matter of Stortecky v Mazzone (85 NY2d 518 [1995]), Stone is still unable to succeed. Though counsel has argued in closing papers that August 29, 2001, the date on which Duffy requested that Merrill Lynch transfer the account into an estate account, was a proper date for divestiture, this date was not proved such at trial. The proofs contain no date which the preponderance of the evidence shows to be a more reasonable date of divestiture than October 7, 2002, the date of the actual transfer. Without any proof as to the reasonable timing of any other proposed dates of divestiture,
*910 Stone’s request that the court pick a date among the various dates and corresponding valuations of the portfolio entered into the record becomes a request for a hindsight determination, and is impermissible as a basis for liability. (Matter of Chase Manhattan Bank, 26 AD3d 824 [2006]; Matter of Saxton, 274 AD2d 110 [2000]; Matter of Clark, 257 NY 132 [1931].)
Causation
Though Stone did not succeed in showing that the Prudent Investor Act required Duffy to convert the estate immediately to cash, Stone’s proof did show some nonfeasance on the part of Duffy, such that a brief discussion of causation is warranted. Any proof of breach advanced by Stone cannot lead to surcharge without the establishment of a link between the fiduciary’s negligence and the loss suffered by the estate. (Matter of Hahn, 93 AD2d 583 [1983].) Duffy’s expert, a forensic economist, offered testimony to show that decedent’s portfolio (as held by the estate and later distributed to Stone) had a “beta” of .94, meaning that the portfolio’s performance correlated extremely closely with the rise and fall of the market itself: “for every 1% move in the S & P 500 total return index, that portfolio would move 0.94%” (Mulcahey tr at 372). It is logical to conclude that the losses experienced by the estate’s portfolio were due to drops in the market itself. To hold Duffy liable for the portfolio’s losses when the portfolio’s valuation fluctuation almost exactly followed the market would be akin to expecting him to have had the prescience to invest and outperform the market, an unreasonable requirement the law does not expect. (EPTL 11-2.3 [b] [1].)
Commissions
Executor’s commissions are set by statute and are mandated (“the court . . . must allow to the fiduciary . . . the following commissions. . . .” [SCPA 2307 (1) (emphasis added)]) as payment for their services. The Surrogate has discretion to deny commissions in circumstances where the fiduciary’s behavior goes beyond negligence, into “misconduct”: “[statutory commissions must be awarded in the absence of . . . allegations of misconduct amounting to dereliction, complete indifference or other comparable acts of misfeasance.” (Matter of Drier, 245 AD2d 787, 788 [1997].)
In Matter of Drier (supra), the fiduciary’s demonstrated good faith in making otherwise unauthorized payments was sufficient *911 to uphold his statutory commissions. See also Matter of Farone (162 AD2d 828 [1990]), where commissions were granted in absence of evidence of misconduct. Note, however, that since the bases for denial of commissions are broader than the single issue of mismanagement of estate funds, a finding of no liability under the Prudent Investor Act does not preclude a denial of commissions.
Here, Stone has alluded to Duffy’s complete indifference, a lack of communication with the beneficiary, and a delay in the estate administration. However, other than the communication issue, Stone has not provided sufficient proof for his claims. Duffy’s evidence showed a plan for the estate and an administration time line that was within what his expert testified was reasonable for the estate completion, and very close to the estimate he originally gave Stone at the time letters were issued. Stone has not sufficiently supported his claim that commissions should be denied.
Legal Fees
Attorneys for an estate are allowed “such compensation for [their] legal services as appear to the court to be just and reasonable.” (SCPA 2307 [1].) Attorneys’ fees are to be evaluated by the Surrogate, who has the responsibility for ensuring that legal fees in estates are within the bounds of reasonableness. (Matter of Middagh, 267 AD2d 593 [1999].) The reasonableness of legal fees is determined by the guidelines articulated in the Freeman and Potts line of cases, often referred to as the FreemanIPotts factors. They are as follows: time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; the lawyer’s experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the bar for similar services; the contingency or certainty of compensation; the results obtained; and the responsibility involved. (Matter of Freeman, 34 NY2d 1, 9 [1974].)
The burden of showing reasonableness of fees is one borne by the attorney. (Cohen v Ryan, 34 AD2d 789 [1970].) Duffy submitted his account, showing a payment of $18,750 for legal services. He did not submit any time records to support this request. Stone argues that Duffy’s legal fees are unreasonable for the size and relative simplicity of the estate.
Duffy has provided no proof of reasonableness of his fees, other than to state the basis of their calculation was equivalent *912 to one executor’s commission. The size of an estate is a permissible factor in calculation of fees, but it is one of several to be considered in a reasonableness determination. Duffy has offered no showing of hours worked; indeed he kept absolutely no time records whatsoever. While time spent is one of the least emphasized factors in setting attorney fees (Matter of Cleveland, 12 Misc 3d 1168[A], 2006 NY Slip Op 51108[U] [2006]), the keeping of time records does serve as evidence of the work performed and results achieved. Duffy has no support for his fees whatsoever other than the two surrogate court proceedings in the estate record, the legal work for which he performed.
While indeed an executor’s commission is a rough guideline for the reasonableness of fees, it is not exclusively determinative of “reasonableness,” which Duffy’s argument essentially states. Duffy would have this court uphold the legal fees based upon no information given as to what work was done and how well and how long it took, but instead solely based upon the calculation of an executor’s commission. This is not acceptable. A showing needs to be made that the fee is reasonable, on other grounds as articulated in Freeman/Potts other than a simple “equivalent to an executor’s commission” calculation. Duffy did not do this.
Duffy is entitled to be compensated for the legal work he proved that he did provide to the estate, namely the surrogate court filings and completion of the tax return. He is therefore entitled to a fee in quantum meruit of $8,000, that is, 40 hours of time, at $200 per hour.
Therefore, in accordance with the above decision it is hereby ordered, adjudged and decreed that Gilbert Stone’s objection seeking to surcharge Michael Duffy for the loss suffered by the estate is hereby dismissed, and it is further ordered, adjudged and decreed that Duffy is granted his commissions, and it is further ordered, adjudged and decreed that attorney’s fees for the estate are hereby approved in the amount of $8,000.