Raymond J. DONOVAN, Secretary of the
United States Department of
Labor, Plaintiff,

v.

John C. BIERWIRTH, Robert G. Freese
and Carl A. Paladino, Defendants.

Joseph W. Ullman, Lillian E. Baldissard,
Rita V. Hafner, Anthony Pancella, Jr.,
Kathleen T. Chew and Benjamin L.
Crews, Intervenor-Defendants.

No. 81 CV 3408.

United States District Court,
E. D. New York.

Dec. 3, 1981.

Francis V. Laruffa, Regional Sol., New York City, Ronald G. Whiting, Deputy Sol., Monica Gallagher, Associate Sol., U. S. Dept. of Labor, Security Div., Washington, D. C., for plaintiff; Robert N. Eccles, Norman P. Goldberg, Sherwin S. Kaplan, Jane M. Kheel, Washington, D. C., of counsel.

Cahill, Gordon & Reindel, New York City, for defendants; Raymond L. Falls, David R. Hyde, Immanuel Kohn, Kenneth W. Orce, George Wailand, New York City, of counsel.

Rains & Pogrebin, P.C., Mineola, N. Y., for intervenor-defendants; Mona N. Glanzer, Bruce R. Millman, Martin Gringer, Mineola, N. Y., of counsel.

*Memorandum of Decision and Order*

MISHLER, District Judge.

Plaintiff Raymond J. Donovan, the Secretary of Labor (the "Secretary"), brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., against the three trustees of the Grumman Corporation Pension Plan (the "Pension Plan") to, inter alia, enjoin acts and practices violative of Title I of ERISA and secure other appropriate equitable relief. The gravamen of plaintiff's complaint alleges that each of the individual trustees have breached their fiduciary duties by expending Pension Plan assets for the purchase of Grumman Corporation stock in an effort to fend off the tender offer made for the Grumman Corporation ("Grumman") by The LTV Corporation. ("LTV"). The details of those open market purchases made by the Pension Plan on October 12 and 13, 1981 have been recounted in a recent decision by this court, *The LTV Corporation v. Grumman Corporation*, 526 F.Supp. 106 (E.D.N.Y. 1981). For the purposes of presentation, we shall once again review the details of those purchases and examine the decision-making process which led to the purchase decision.

The material facts are either conceded or beyond dispute, and accordingly, this motion did not necessitate an evidentiary hearing. The court has thoroughly reviewed the exhibits and depositions submitted at the time of argument on October 30, 1981 and now makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FACTS

On September 24, 1981, The LTV Corporation publicly announced that it was making a tender offer for up to 70% of the Grumman Corporation's outstanding stock and securities convertible into stock conditioned upon acquiring at least 50.01% of Grumman stock on a fully diluted basis. On the day prior to the announcement, Grumman's Chief Executive Officer and Chairman of the Board of Directors, John C. Bierwirth, was informed of LTV's intentions while vacationing on the Mississippi River. He returned to Grumman headquarters at Bethpage, New York midday on the 24th. He did not confer with Grumman personnel concerning the LTV offer until his return. The Grumman Board of Directors convened September 25 and passed a resolution to fight the takeover. Thus, the commencement of Grumman's well orchestrated plan to defeat the LTV tender offer was set into motion.

The Pension Plan held 525,000 shares of Grumman stock prior to the October purchases. The market value of that investment immediately before the tender offer (at $25 per share) was approximately $13,-

125,000. LTV's offer to purchase Grumman stock for $45 per share presented the Pension Plan with the possibility of realizing a substantial gain on its Grumman investments.

Three days after the Board's decision to oppose the LTV takeover, Mr. Bierwirth, acting as Chairman of the Board, in a letter directed to "Fellow Grummanite(s)," observed the following:

> We're very optimistic about our chances of defeating the takeover bid. About a third of all shares are held by Grumman's employee investment and pension plans. These plans are managed by Grummanites who will look long and hard at how well their fellow members would be served by selling off Grumman stock.

It was indeed the obligation of the Pension Plan trustees to take a long hard look at how the Plan would be served by tendering its Grumman stock.

Mr. Bierwirth spent approximately 90% of his working hours during the two-week period following his return to Long Island trying to understand the LTV offer and simultaneously denouncing it through public meetings with reporters, employees and retirees. His decision as a trustee of the Pension Plan to refuse the opportunity to tender was arrived at during a special meeting of the trustees on October 7. The meeting lasted somewhere between one and two hours while the discussion of whether to tender took approximately one-half hour. (Freese dep. at 30). Other than the trustees, John Mullan, in-house counsel for Grumman, was the only other individual present at the special meeting. John Mullan had not been formally retained by the Pension Plan as counsel. The trustees failed to consult with outside counsel, or any independent investment advisor. In part, they relied on the opinion of Dillon, Read & Co., an investment banking firm retained by Grumman to render an opinion solely on the adequacy of LTV's offering price.

The other Pension Plan trustees are Robert G. Freese and Carl A. Paladino. Approximately fifty percent of Freese's time between the announcement of the tender offer and the actual Pension Plan purchases was devoted toward raising bank credit for the purchase of Grumman common stock by Grumman. Paladino's only activity between September 23 and October 7 involved the preparation of financial material concerning Grumman Aerospace, a subsidiary of Grumman. (Paladino's dep. at pp. 13–16). He had neither formally nor informally, prior to the October 7 trustees' meeting, discussed the possibility of a Pension Plan purchase of Grumman stock. (Paladino's dep. at 24–25).

The October 7 trustees' meeting commenced with a ten-minute presentation by Mr. Mullan about ERISA, (Freese dep. at 24–25), and culminated in a unanimous vote by the trustees not to tender the Grumman shares already owned by the Pension Plan. Further discussions led to a second decision wherein they voted to purchase up to an additional 1,275,000 shares of Grumman stock. The decision not to tender was announced in a press release on October 8, the same day on which the trustees executed an amendment to the Plan's Trust Agreement providing for indemnification of the trustees by Grumman for liability arising out of any action absent willful misconduct or lack of good faith. The amendment agreement was dated October 7.

The October 7 decision to purchase Grumman stock was conditioned upon approval by the Securities and Exchange Commission of an exemption from Rule 10b–6, 17 C.F.R. § 240.10b–6, which prohibits persons interested in a "distribution" of stock from trading in that stock. The exemption was granted on October 9. Nevertheless, no purchases were made until October 12. The trustees hoped that this court would enjoin the LTV tender offer over the following weekend thereby avoiding the Pension Plan purchases at the artificially high prices created by the tender offer, or alternatively, avoiding the purchases altogether. (See Bierwirth dep. at 43–44). The injunction did not issue that weekend. The trustees convened briefly on October 12 and, without further discussion on the subject, decided to proceed with their purchases.

The Pension Plan purchased 958,000 shares through Dillon, Read & Co. on October 12. The price ranged from a low of $36 to a high of $39⅝ at an average price of $38.61 per share. On October 13, Dillon, Read & Co. purchased an additional 200,000 shares on behalf of the Pension Plan at an average price of $36.62 per share.

The trustees offer essentially two theories of defense to the Secretary's claims. First, they believed that the Grumman stock represented a good investment for the Pension Plan. Secondly, they were concerned over the impact of an LTV takeover on the Pension Plan. The latter concern was twofold—that the Grumman Plan might be merged, terminated or otherwise altered to the detriment of its beneficiaries and that LTV's financial health, upon which its pension plans ultimately depend for contribution, was unsound.

## II. DISCUSSION

In its instant motion for preliminary relief, the Secretary contends that each trustee breached his fiduciary obligation by, *inter alia*, (1) failing to act solely in the interest of the Pension Plan's participants and beneficiaries and for the exclusive purpose of providing benefits to its participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A)[1] and (2) failing to act with the care, skill, prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use in the

conduct of a similar enterprise with similar objectives, in violation of Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B).[2]

The Pension Plan is an employee benefit plan established and maintained by Grumman. The plan is an employee benefit plan within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3) and therefore subject to ERISA rules and regulations pursuant to Section 4(a) of ERISA, 29 U.S.C. § 1003(a). The Secretary of Labor has standing to maintain this action under Sections 502(a)(2), (5) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (5). Jurisdiction and venue in this court are proper under Sections §§ 1132(e)(1), (2).

### A. *Dual Loyalties*

Each of the trustees of the Pension Plan is also an officer of Grumman or a Grumman subsidiary. John C. Bierwirth is the Chief Executive Officer and Chairman of the Board of Directors of Grumman; Robert G. Freese is a Senior Vice President and a Director of Grumman; and Carl A. Paladino is a Senior Vice President of Grumman Aerospace Corporation, a subsidiary of Grumman. Each of the trustees is a fiduciary with respect to the Pension Plan within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

The alleged violations of ERISA arise from the difficult task presented to defendants during the time of the LTV tender offer of simultaneously serving two mas-

1. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) provides as follows:
   Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
   for the exclusive purpose of:
   (i) providing benefits to participants and their beneficiaries; and
   (ii) defraying reasonable expenses of administering the plan.

2. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) provides as follows:
   Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall dis-

charge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.
The Secretary also contends that the trustees have violated ERISA § 406(b)(1) and (2), 29 U.S.C. § 1106(b)(1) and (2). Even assuming the trustees have committed such violations, the scope of the preliminary relief would be unaffected. Accordingly, we decline the opportunity to pass on these claims.

ters—Grumman and the Pension Plan. It is argued that the separate loyalties ("dual loyalties") created by their dual employment prevented the trustees from acting exclusively in the Pension Plan's interest. It is further argued that subsequent to LTV's tender offer it was *per se* unlawful for the plan's fiduciaries to act on its behalf because of their dual loyalties, without regard to whether their secondary loyalty (to Grumman) influenced their conduct. It is the latter contention which we now address.

■ Part 4 of Title I sets forth the fiduciary obligations which the Grumman trustees undertook to faithfully discharge. At the outset, we hold that ERISA contemplates the existence and approval, in certain circumstances, of fiduciaries acting on behalf of a pension plan even though they have dual loyalties. Section 408(c)(3) of ERISA, 29 U.S.C. § 1108(c)(3), implicitly authorizes an officer of the sponsor corporation to serve as a pension plan fiduciary by providing that Section 406 of ERISA, 29 U.S.C. § 1106 (specifying prohibited transactions), shall not be construed so as "to prohibit any fiduciary . . . from serving as a fiduciary in addition to being an officer, employee agent, or other representative of a party in interest." Further, ERISA section 407, 29 U.S.C. § 1107 specifically authorizes a plan to acquire stock of the sponsoring corporation. ERISA therefore necessarily contemplates that trustees, who may be officers of the sponsoring company, may act on behalf of the pension plan in making investment decisions concerning stock of the sponsor corporation in spite of a potential conflict of interests.

A more detailed review of the statutory scheme of ERISA and its legislative history corroborates the foregoing conclusion. As previously stated, ERISA section 408(c)(3), 29 U.S.C. § 1108(c)(3), expressly contemplates fiduciaries with dual loyalties. The Conference Report on ERISA states that the statute "makes it *clear* that a party-in-interest may serve as a fiduciary in addition to being an officer . . . ." H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess, 312, *reprinted in* 1974 U.S.Code Cong & Ad.News 5038,

5092 (emphasis added). The Conference Report also contemplates a number of additional exceptions to the traditional rules governing fiduciary conduct. *See id.*

■ Having provided for an unorthodox departure from the common law rule against dual loyalties, Congress provided two statutory safeguards to protect plan participants and beneficiaries. First, the statute provides that "a fiduciary shall discharge his duties with respect to a plan *solely* in the interest of the participants and beneficiaries . . . ." Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1) (emphasis added). Therefore, although a trustee may have dual loyalties, when acting on behalf of the fund, his primary loyalty to the fund is the *only* loyalty which may affect his judgment.

■ Mindful of the difficulty presented to trustees so situated, Congress enacted Section 406 of ERISA as a further protection for plan participants and beneficiaries. That section prohibits a fiduciary from acting in *certain specified circumstances* in order to prevent him "from being put in a position where he has dual loyalties, and, therefore, . . . cannot act exclusively for the benefit of a plan's participants and beneficiaries." H.R.Conf.Rep.No.1280, *supra*, at 309, *reprinted in* 1974 U.S. Code Cong. and Ad.News at 5089. The Conference Report's concern with the dangers inherent in the case of a fiduciary with dual loyalties was expressed in connection with ERISA section 406(b)(2), 29 U.S.C. § 1106 (b)(2), which prohibits fiduciaries from acting "in any transaction involving the plan on behalf of a party (or represent a party) whose interests are *adverse* to the interests of the plan or the interests of its participants or beneficiaries." (emphasis added). If we are to interpret ERISA as incorporating a *per se* prohibition against plan fiduciaries with dual loyalties acting on behalf of the plan, then the specific prohibition enacted to prevent a fiduciary from being placed in a position of dual loyalty is completely superfluous. *See id.* The negative implication, of course, is that Congress intended that fiduciaries with dual loyalties would be per-

mitted to act in all other instances as long as they otherwise comply with ERISA section 404 and the balance of the restrictions found in ERISA section 406.

In construing ERISA, we are mindful of its remedial purposes and are therefore reluctant to depart from the inflexible, well established common law rule which precludes a fiduciary having dual loyalties from asserting the defense "that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of the secondary one." *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941), *quoted in NLRB v. Amax Coal Co.*, 453 U.S. 322, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672, *reh'g denied*, 453 U.S. 950, 102 S.Ct. 26, 69 L. Ed.2d 1036 (1981). This well established rule naturally followed from the recognition in the courts of chancery of a trustee's "unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties." *NLRB v. Amax Coal Co.*, 453 U.S. at 329, 101 S.Ct. at 2794.

■ Nevertheless, even at common law, trustees are allowed to trade in securities or other property of an entity with which they are affiliated as long as authorization is provided by the terms of the trust. Restatement (Second) of Trusts § 170, comment n. ("[s]uch a purchase is proper . . . if expressly or impliedly authorized by the terms of the trust"). *Accord, Central Hanover Bank & Trust Co. v. Russell*, 290 N.Y. 593, 48 N.E.2d 704 (1943) (mem.); 2 A. W. Scott, *Law of Trusts* § 170.15 at 1340–41 (3d ed. 1967). We find that Section 407 of ERISA is Congress' authorization for a trustee to invest in sponsor corporation stock in spite of dual loyalties and conflicting interests *so long as* (1) he acts exclusively for the benefit of the plan beneficiaries and participants and otherwise complies with ERISA section 404, and (2) his actions are not violative of the proscriptions of ERISA section 406. Thus, the statutory scheme has abrogated the traditional common law rule. However, bearing in mind the purposes of ERISA, we further hold

that a trustee having dual loyalties has "an *especial obligation* to act fairly on behalf of those concerned with the results of the action taken." *Withers v. Teachers' Retirement System of the City of New York*, 447 F.Supp. 1248, 1256 (S.D.N.Y.1978), *aff'd mem.*, 595 F.2d 1210 (2d Cir. 1979) (applying common law principles of fiduciary duty) (emphasis added). The Grumman trustees had that very obligation when dealing with Grumman stock.

Our rejection of the Secretary's contention that the trustees' conduct was *per se* unlawful is not contrary to the Supreme Court's recent decision in *NLRB v. Amax Coal Co.* There, the Court held that the employer-selected trustees of a trust fund created under Section 302(c)(5) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 186(c)(5), were not employer representatives (or agents) "for the purposes of collective bargaining or the adjustment of grievances" within the meaning of Section 8(b)(1)(B) of the National Labor Relations Act, as amended by Section 101 of the LMRA. In so construing Section 8(b)(1)(B), the Court recognized that a trustee complies with his fiduciary obligations under ERISA *so long as* he refrains from engaging in specified prohibited transactions and acts "exclusively for the benefit of the plan's participants and beneficiaries." *See NLRB v. Amax Coal Co.*, 453 U.S. at 334, 101 S.Ct. at 2796, *quoting* H.R.Conf. Rep.No.1280, *supra*, at 296–309, *reprinted in* 1974 U.S.Code Cong. & Ad.News at 5089. In acknowledging that a trustee might possess a dual and conflicting loyalty to the appointing sponsor of the trust plan, the Court simply stated that the trustee "must overcome" that loyalty. *Id.* at 2796. Finally, the discussion of dual loyalties in the context of an employer-financed trust fund is distinguished from the instant case because ERISA's statutory scheme, unlike the LMRA, clearly contemplates the approval of fiduciaries with dual loyalties.

■ Accordingly, we find that the trustees of the Pension Plan did not commit *per se* violations of ERISA either by their failure to abstain from the investment decision

concerning Grumman stock or by the mere acquisition of Grumman stock. *See Curren v. Freitag,* 432 F.Supp. 668, 672 (S.D.Ill. 1977).

### B. *Section 404(a)(1)(B) and the Prudent Man Rule*

#### 1. *The Standard*

■ The Secretary further argues that even if the trustees were permitted to make investment decisions (the decision to buy, sell, or hold) concerning the Grumman stock in the face of the LTV tender offer, they failed to act prudently as required by ERISA section 404(a)(1)(B). At the outset, we hold that this affirmative statutory duty—the duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims"—subsumes the duty "to make an independent inquiry into the merits of a particular investment" decision. *See Fiduciary Standards and the Prudent Man Rule under ERISA,* 88 Harv.L.Rev. (Part 2) 960, 965 (1975).

■ A review of a fiduciary's independent investigation is one of the well-established yardsticks against which courts have customarily tested fiduciary conduct for prudence. *See, e.g., Withers v. Teachers' Retirement System,* 447 F.Supp. at 1254–55; *In re Talbot's Estate,* 141 Cal.App.2d 309, 296 P.2d 848 (1st Dist. 1956); *In re Clark's Will,* 257 N.Y. 132, 177 N.E. 397 (1931); *In re Kent's Estate,* 146 Misc. 155, 261 N.Y.S. 698 (Sur.Ct.1932), *aff'd sub nom. In re Manufacturers Trust Co.,* 246 A.D. 604, 284 N.Y.S. 976 (1935); 3 A. W. Scott, *Law of Trusts,* § 227.1 at 1809–11. This same test is properly applied in the instant case to test defendants' conduct. *See Morrissey v. Curran,* 567 F.2d 546, 548–49 & n.9 (2d Cir. 1977).

■ However, when a fiduciary has dual loyalties, his independent investigation into the basis for an investment decision which presents a potential conflict of interests must be both intensive and scrupulous and must be discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan. Were the rule less stringent, we could not be certain that the Cardozian time-honored standard for fiduciary behavior—"the punctilio of an honor the most sensitive," *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928)—would remain uncompromised. Moreover, this greater standard of care is a natural corollary to the trustee's heightened obligation to act fairly when acting with dual loyalties and is fully consistent with principles of equity and the policies underlying ERISA. *See Gilliam v. Edwards,* 492 F.Supp. 1255, 1261 (D.N.J.1980) ("To fulfill its curative aim, ERISA should be given a liberal construction to safeguard the interests of the Fund participants and beneficiaries and to preserve the integrity of Fund assets"). A thorough review of the record compels us to find that each of the trustees were woefully remiss in this regard and that the Secretary has satisfied his burden on this motion for a preliminary injunction.

#### 2. *The Standard Applied to the Instant Case*

Defendants contend that they "gave *appropriate consideration* to the factors relevant to ERISA's standard of prudence." (Defendants' Memorandum of Law, dated October 29, 1981) (emphasis added). They argue that their decision to purchase Grumman shares was based upon their *belief* (1) that the Grumman stock presented a unique and substantial opportunity for long-term appreciation and was consistent with the portfolio needs of the Pension Plan and (2) that their decision was designed to further the purposes of the Plan and the interests of its beneficiaries.

■ However, as indicated above, a belief, even a good faith belief, held by the trustees does not insulate them from charges that they have acted imprudently. An examination of the facts in *Withers v. Teachers' Retirement System of the City of New York,* 447 F.Supp. 1248 (S.D.N.Y.1978),

*aff'd mem.,* 595 F.2d 1210 (2d Cir. 1979), illustrates defendants' shortfallings in acting on behalf of the Pension Plan. Even though the Teachers' Retirement System (the "TRS") was not subject to ERISA, as we have previously noted, the same fiduciary principles apply since the trustees in *Withers,* as in the instant case, were subject to common law principles of fiduciary duty. *See Marshall v. Teamsters Local 282 Pension Trust Fund,* 458 F.Supp. 986, 990 (E.D. N.Y.1978).

In *Withers,* the defendant trustees of the TRS were sued for allegedly having breached their fiduciary obligation to the TRS by authorizing the purchase of $860 million of New York City bonds during the City's financial crisis in November 1975. The bonds were highly speculative and unmarketable. Judge Conner found that the trustees had properly acted since they concluded, after a thorough independent investigation of the facts, that the long term viability of the TRS depended on the investment in New York City bonds. In finding that the trustees had fulfilled the obligation of independent investigation the court noted the following: (1) their conclusion that the bankruptcy of New York City was imminent was based on opinions from *highly reliable sources* and represented the *consensus* of a *broad spectrum* of opinion; (2) they participated in *frequent meetings* with City, State and Municipal Assistance Corporation ("MAC") officials during the summer and fall of 1975 concerning the deteriorating state of the City's finances; (3) in November 1975, there were *frequent meetings* among the trustees and the New York City Comptroller and Corporation Counsel to discuss the problems of the City's budget; (4) they acted on *all* the information available to them and "went to *great lengths* to satisfy themselves of the absence of any reasonable possibility" that investment in City bonds could be avoided, (emphasis added); (5) after concluding investment was necessary, they made every reasonable effort to "secure *maximum protection* for the beneficiaries of the TRS," (emphasis added); (6) the trustees made their decision without succumbing to the pressure exerted

by both the Governor's office and by City Hall; and finally, (7) "their decision to invest in the City obligations was ... forged from *intensive independent analysis* as well as consultation with experts." (emphasis added).

For the purposes of this motion, we shall assume that the interests of the Grumman Pension Plan were identical with those of Grumman. Our inquiry is directed solely to the manner in which the trustees exercised their judgment in committing Pension Plan assets amounting to some $36,988,380 (958,-000 shares at an average price of $38.61 per share) on October 12 and $7,324,000 (200,000 shares at an average price of $36.62 per share) on October 13. These purchases represented a substantial commitment of Pension Plan assets which had been estimated to be in excess of $600,000,000 at its most recent valuation.

■ It is no defense to the Secretary's instant action that the trustees' decision to fight the LTV tender offer with Pension Plan assets might have been in the best interests of the Plan *if* their decision was arrived at without a thorough independent investigation of the basis for that decision. Luck or good fortune is no substitute for a trustee's duty of inquiry.

■ We find that the trustees acted imprudently in purchasing Grumman stock on October 12 and 13. We further find that their conduct between the date of the LTV tender offer and mid-October evince an inability to make independent decisions on behalf of the Pension Plan solely in the interest of its participants and beneficiaries. We reach these conclusions because the trustees' decisions were made without sufficient inquiry into the facts upon which they based their decisions. We find that their conduct was solely motivated by their all-consuming desire to defeat the tender offer.

The deposition testimony of the three trustees provides overwhelming support for our conclusion. Rather than analyzing the offer, the trustees spent most of their time between September 24 and October 13 fighting the LTV tender offer. Even

though it is clear that Bierwirth had, at most, a superficial understanding of the offer on September 25, he voted as a director of Grumman to reject the tender offer that same day. Our conclusion that he failed to understand the offer on the 25th is supported by his own deposition testimony. (Bierwirth dep. at 9, spent three weeks "trying to understand what the offer was ...."). While a reasonable inference is that Bierwirth had no interest in considering the LTV offer regardless of the potential for Grumman or the Pension Plan, Bierwirth would challenge this inference because of his "justifiable reliance" on the Dillon, Read & Co. opinion letter which was presented to the Board of Directors on September 25. We reject that contention out of hand and find that Bierwirth was committed to defeating the LTV takeover prior to the September 25 board meeting for reasons unrelated to the Dillon, Read & Co. opinion letter.

Mr. Thayer, Chairman of the Board of Directors and Chief Executive Officer of The LTV Corporation, testified subject to cross-examination by Grumman in the related case *Grumman Corp. v. The LTV Corp.*, No. CV 81–3156, that Mr. Gavin, President of Grumman and speaking on behalf of Bierwirth, prior to the tender offer, rejected LTV's offer to discuss merger prospects. The Grumman rejection came only one hour after LTV's inquiry. Bierwirth was aware of the merger proposal on September 23 and it appears that he personally rejected the offer for discussions on the subject. (*See* Bierwirth dep. at 6). The rejection came notwithstanding the assurance provided by LTV that Bierwirth would have been retained as the Chief Executive Officer of a joint Grumman-Vought Aerospace operation. Nowhere in his deposition testimony did Bierwirth indicate that he opposed the takeover because of the potential antitrust violations and the related problems of future divestiture.

Mr. Bierwirth served as Grumman's chief public spokesman in opposing the LTV takeover. He spent virtually all of his time in activities related to the takeover which included attending meetings, lobbying in Washington, D. C., appearing on talk shows and discussing the crisis with reporters. His deposition testimony fails to reveal any effort to understand how the Pension Plan, as opposed to Grumman, might have been advantaged by tendering its Grumman stock to LTV or how the fund might have been protected in the event of an LTV takeover. His inability to consider, or to request discussions, on the protection of Pension Plan benefits (and the survival of the Grumman plan as an independent plan) stemmed from his fear of a solution which would have seriously compromised his position as an advocate against the LTV takeover on behalf of Grumman. Bierwirth was totally committed to Grumman's resolution to quash the takeover bid.

In deciding as a Pension Plan trustee to reject the tender offer, Bierwirth "was quite interested in Carl Paladino's analysis of LTV ...," presented at the October 7 trustees' meeting. (Bierwirth dep. at p. 33). Paladino, however, was hardly a financial expert with respect to LTV. As previously mentioned, the only work performed by Paladino between September 23 and October 7 was the preparation of financial material on Grumman Aerospace. (Paladino dep. at 16). Paladino's only knowledge of LTV's financial position derived from his examination of the LTV annual report and the LTV 10–K. (Paladino dep. at 36). The trustees did not consult William Parmentier and his investment staff with regard to LTV's financial prospects. The third trustee, Mr. Freese, spent more than half of his time for the three weeks following September 25 arranging a bank line of credit for the future purchase of Grumman stock by Grumman.

Clearly, the trustees spent the abundance of their combined waking hours searching for LTV's Achille's heel and otherwise opposing the tender offer. It would be charitable to say that they "took a long and hard" look at how the takeover might damage the interests of the Pension Plan without endeavoring to make any examination of how its interests might have been advanced. Indeed, there was no real inquiry

into the dangers presented to the Pension Plan in the event of a takeover. We find that their conclusions regarding the dangers presented by the takeover were based on conjecture, speculation and unfounded assumptions.

As we have previously mentioned, the trustees never considered that they might strike a deal with LTV which could have protected the Pension Plan. The following inquiry was made of Bierwirth:

Q. Was there any consideration as to the existing Pension benefits leaving aside the gratuitous increase, any consideration to tendering subject to attempting to obtain some protection for the basic Pension benefits?

Bierwirth responded by stating one of his many unfounded assumptions:

A. I think you would have to say that we were of the opinion that you could not protect, so we did not discuss how we could give partial protection.

(Bierwirth dep. at 29). LTV having once indicated a willingness to "talk merger" and having publicly pledged that it would not merge or terminate the Grumman Pension Plan (Bierwirth dep. at 25; Paladino dep. at 38), there was no basis for believing that LTV would have been unreceptive to discussions concerning security for Grumman Pension Plan participants and beneficiaries.

A host of other examples confirm that the trustees failed to act prudently. They failed to consult with outside, independent counsel.[3] In spite of the numerous and difficult questions presented by the LTV tender offer, we must reiterate that the October 7 meeting lasted less than two hours with only one-half hour devoted to the decision to reject the offer. The decision not to tender, and thereafter, to purchase, was arrived at without the consulta-

tion of an independent investment advisor. Yet, Pension assets were expended with the knowledge that if the trustees' objectives were realized, the Pension Plan would have to absorb substantial short-term losses.[4]

Defendants contend that independent investment advice was unnecessary since the Plan historically handled investment matters in-house. However, the in-house investment staff was not consulted. Viewing the October 12 and 13 purchases from solely an investment standpoint, i.e., ignoring the alleged impact on the Plan in the event of a takeover, taking notice of the availability in the marketplace of other investments, and considering that Grumman stock was selling at an all time high, the trustees also should have considered the long-term appreciation offered by other stocks with the advice of an investment counselor. It is axiomatic to state that any given investment is sensible only if it is superior to other investments available in the marketplace.

The trustees contend that they had guidance from reliable investment advisors. They cite the July 1981 Lehman Brothers Kuhn Loeb ("Lehman Brothers") research report which recommended the purchase of Grumman common stock to LTV. The report, however, did not render an opinion on the market value of the Grumman stock and the recommendation was made at a time when Grumman stock was trading at $28 per share. The Lehman Brothers' report was hardly support for the proposition that Grumman stock was worth $45 per share to any investor. The tender offer price naturally included a premium for majority control over Grumman as was evidenced by LTV's condition of purchase (the acquisition of at least 50.01% of Grumman common stock on a fully-diluted basis). In contrast, the Pension Plan did not seek control. Without further analysis, it is evident that the Lehman Brothers' recommendation, pre-

**3.** The only counsel available at the October 7 trustees' meeting was John Mullan, in-house counsel to Grumman. The propriety of consulting Grumman's counsel under such circumstances is subject to serious question.

**4.** Following the affirmance by the Second Circuit Court of Appeals of our decision enjoining the LTV tender offer, *Grumman v. The LTV Corp.*, 665 F.2d 10 (2d Cir. 1981), the Pension Plan paper losses exceeded $10 million.

pared with LTV's unique financial position and business objectives in mind, was inadequate support for the trustees' decision to purchase Grumman stock at $45 per share.

Likewise, the trustees were not justified in relying on the Dillon, Read & Co. opinion prepared for the Grumman Board of Directors, dated September 25, 1981. The opinion letter drafted for the Board expressly noted that Dillon, Read & Co. had "provided investment banking services to Grumman in the past, including acting as a manager of an offering of its convertible subordinated debentures in April, 1980." Dillon, Read & Co. had an obvious interest in Grumman's continuing independence, and therefore, as horn book law indicates, its opinion should have been subject to some level of scrutiny:

> In reaching his conclusion [concerning an investment decision, a trustee] may take into consideration advice given to him by attorneys, bankers, brokers and others whom prudent men in the community regard as qualified to give advice. He is not justified, however, in relying wholly upon the advice of others, since it is his duty to exercise his own judgment in the light of the information and advice which he receives. In relying upon the advice of another, he should consider whether the person giving the advice is disinterested. Thus it has been held that in purchasing securities for the trust he is not justified in relying solely on the advice of a broker interested in the sale of the securities.

3 A. W. Scott, *Law of Trusts*, § 227.1 at 1809. The two-page opinion letter was reviewed by the Pension Plan trustees at the October 7 meeting.[5] The letter was unaccompanied by any underlying financial statistics and no representative from Dillon, Read & Co. was present for questioning. Nevertheless, the trustees relied on a report literally prepared overnight and based on the limited amount of information available at the time of the report's preparation. It was gross negligence, if not bad faith, to rely on such a report prepared some twelve days prior to the October 7 meeting *without any effort* to have Dillon, Read & Co. update their evaluation of LTV's offer.[6]

In connection with the foregoing, the balance of pertinent facts surrounding the trustees' decision compel us to conclude that they in fact proceeded in bad faith. Between the time of the tender offer and the October Pension Plan purchases, they had one goal—to defeat the tender offer. Their policy was one of "conscious avoidance"; they intentionally avoided any inquiries which might have indicated that the success of LTV's tender offer could have been favorable to the Pension Plan.

The trustees had been educated on the complexities of "what goes on in the world of takeovers." (Bierwirth dep. at 7). Earlier in 1981, Grumman had retained the firm of Skadden, Arps, Slate, Meagher & Flom ("Skadden, Arps") to render such advice. By retaining Skadden, Arps, the Grumman board manifested an understanding of the need to have expert legal advice on matters involving intricate federal statutes and administrative regulations. Each of the trustees were, and are, sophisticated businessmen. Yet, after having been shown pertinent sections of ERISA by Mr. Mullan at the October 7 meeting and after a brief oral presentation concerning the obligations of plan fiduciaries under ERISA, the trustees had no questions. (Paladino dep. at 30; Freese dep. at 24–25). Their lack of concern or curiosity about the intricacies of ERISA and how it might affect the Pension Plan's ability to respond to the tender offer is in sharp contrast to the forward thinking decision of the Grumman directors, including Bierwirth and Freese, in retaining Skadden, Arps for general ad-

---

5. The two-page opinion letter authored by Dillon, Read & Co. upon which defendants so heavily relied was not submitted in opposition to the Secretary's motion until the court, *sua sponte*, made a request to defendants' counsel for its production on November 23, 1981.

6. We also agree with the Secretary that no reliance could be placed upon the press release announcing the New York State Comptroller's decision not to tender the 60,000 Grumman shares held by the state pension plan.

vice on corporate takeovers. The failure to retain counsel with an expertise in the area of ERISA during the four day period between the October 7 meeting and the massive buying campaign commencing on October 12 is strong evidence of their desire to *avoid* advice that might counsel against pension plan purchases. There was ample time to seek advice and it was no coincidence that the trustees failed to do so. Finally, their execution of the Trust Agreement Amendment dated October 7, 1981 which "clarified" the Pension Plan trustees' right to indemnification (Paladino dep. at 67; exhibit 2), is a further indication of their awareness of ERISA's intricacies and the need for legal advice on matters related to the Pension Plan defense of the LTV takeover.

The trustees ignored other inquiries which should have been made. Plan fiduciaries have an affirmative duty to "[defray] reasonable expenses of administering the plan." Section 404(a)(1)(A)(ii) of ERISA, 29 U.S.C. § 1104(a)(1)(A)(ii). Nevertheless, Paladino and Freese had no knowledge as to whether Dillon, Read & Co. was paid a brokerage commission for executing the October 12 and 13 purchase transactions. (Freese dep. at 41; Paladino dep. at 56). While Bierwirth knew that Dillon, Read & Co. was paid seven and a half cents a share, he had no idea whether that commission ($86,850 in total) was standard. (Bierwirth dep. at 56–57).

Even assuming, as the trustees contend, that they were entitled to consider the impact on the Pension Plan of a successful LTV tender offer, we decline to detail their lack of prudence in this regard, except as is evident from the following: (1) none of the trustees knew how many pension plans were sponsored by LTV; (2) no effort was made to learn anything about LTV's pension plans; further, Bierwirth and Freese never considered examining the Internal Revenue Service Form 5500 annual report which all pension plans file even though they were aware that such reports are filed; (3) though much was made of the $225 million unfunded pension liability assumed in connection with the LTV acquisition of the Lykes Corporation, the trustees neither knew nor investigated why, when or how it came about; Mr. Freese suspected that the unfunded pension liability was not attributable to LTV mismanagement; and finally (4) though they claim they were fearful that LTV would merge or terminate the Pension Plan (a) Bierwirth and Freese were aware of public pledges from LTV to the contrary but took no steps to secure such assurances and (b) Paladino admitted no basis for believing that LTV would terminate the Pension Plan.

The conduct of the trustees reflects a silent agreement among them (1) to "see, hear, and speak" nothing positive about the LTV tender offer and avoid any inquiries which might have uncovered facts to the contrary and (2) to isolate themselves from legal advice which might have precluded the Pension Plan from participating in the well orchestrated plan to kill the LTV takeover. The unavoidable conclusion is that the trustees failed to discharge their duty of prudence either diligently or in good faith.

## III. PRELIMINARY RELIEF

The statutory provisions of ERISA authorize the court to award the relief it deems appropriate upon finding that a fiduciary has breached responsibilities, obligations or duties arising under the statute. In pertinent part, ERISA section 409(a), 29 U.S.C. § 1109(a) provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which may have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary....

We find that further proceedings are required in order to fashion the relief which will most suitably promote the interests of the Pension Plan, its participants and its beneficiaries.

The relief requested by the Secretary is the appointment of a receiver *pendente lite* who can independently assess the desirability of disposing or holding the Grumman stock held by the Pension Plan. The Secretary does not object to the continuing service by defendant trustees, *pendente lite*, in all matters except as to the Grumman stock. The identical request for preliminary relief has been made in a related case, *Lawrence v. Grumman Corporation Pension Plan*, No. CV 81–3530, not yet consolidated with this action.

Plaintiff has shown a likelihood of success on his claim that each of the trustees has acted imprudently with respect to their recent investment decisions concerning Grumman stock. They have manifested an inability to separate their corporate loyalty and their loyalty to the Pension Plan. The manner in which they exercised their judgment with respect to the Grumman stock was so egregiously imprudent that we must infer a likelihood of further violations. The very decision to hold Grumman stock makes Grumman a less likely candidate as a takeover target. The conduct of the Pension Plan trustees has demonstrated the difficulty that they have in examining objectively an investment decision which might affect the independence of Grumman.

While it is clear that interim relief pursuant to ERISA section 409 is in order, we are reluctant to fashion such relief without comment from all interested parties. We would consider a number of factors for the purposes of selecting an interim remedy including: "(1) the purposes of the trust; (2) the relative pecuniary advantages to the trust estate of the various remedies; (3) the nature of the interest of each beneficiary; (4) the practical availability of the various remedies; and (5) the extent of the deviation from the terms of the trust required by the adoption of each of the remedies." *Eaves v. Penn*, 587 F.2d 453, 462–63 (10th Cir. 1978), *quoting* Restatement (Second) of Trusts § 214 comment D.

Accordingly, the parties, including the interested parties in the action entitled *Lawrence v. Grumman Corporation Pension Plan*, No. CV 81–3530, as well as any participants and beneficiaries who so desire, are directed to submit recommendations and arguments for the appropriate type of relief on or before December 18, 1981. Until such time as this court fashions further preliminary relief following the aforementioned submission date, John C. Bierwirth, Robert G. Freese and Carl A. Paladino, in their capacity as trustees of the Grumman Corporation Pension Plan, are hereby restrained from buying, selling or exercising any powers, rights or other duties on behalf of said Plan respecting stock or other securities issued by the Grumman Corporation except upon the written consent of the Secretary of Labor, and it is

SO ORDERED.