DISTRICT 65, UAW, et al., Plaintiffs,

v.

HARPER & ROW, PUBLISHERS, INC.,
et al., Defendants.

Raymond C. HARWOOD, et
al., Plaintiffs,

v.

HARPER & ROW, PUBLISHERS, INC.,
et al., Defendants.

Nos. 82 Civ. 3657(MGC), 82
Civ. 4042(MGC).

United States District Court,
S.D. New York.

Sept. 30, 1987.

Dreyer & Traub, New York City, for plaintiffs District 65, UAW, et al. by Eugene Mittelman.

Shea & Gould, New York City, for plaintiffs Raymond C. Harwood et al. by Stuart A. Smith, Martin H. Samson.

Gary M. Ford, John H. Falsey, Stephen D. Schrieber, Kenton Hambrick, Washington, D.C., for Pension Benefit Guar. Corp.

Weil, Gotshal & Manges, New York City, for defendants Harper & Row, Publishers, Inc. et al. by Dennis J. Block, Nancy E. Barton, Richard L. Levine.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for defendant Prudential Ins. Co. of America by Howard Kristol.

## OPINION

CEDARBAUM, District Judge.

These actions arise from Harper & Row Publishers, Inc.'s ("Harper & Row") termination of the Harper & Row Publishers, Inc. Retirement Plan ("the Retirement Plan") in December 1981. After terminating the Retirement Plan, Harper & Row liquidated the fund, purchased annuities to provide for accrued benefits, and recaptured the excess contributions. Harper & Row used the excess to purchase approximately one-third of its outstanding shares then held by defendant Minneapolis Star & Tribune Company ("MST").

This is a motion by defendant Pension Benefit Guaranty Corporation ("PBGC")[1] for the court to appoint a new plan administrator to reallocate and redistribute the assets of the terminated pension plan solely because the 1981 allocation and distribution of the assets of the plan were not carried

---

1. During discovery, defendant/cross-claimant Pension Benefit Guaranty Corporation ("PBGC") received documents which it claims show that the allocation of the Retirement Plan's assets following termination was carried out by individuals other than the entity designated by Harper & Row as the Plan Administrator. Based on this information, PBGC amended its cross-claims against Harper & Row to allege that the company's failure to have the Plan Administrator carry out the allocation of the Retirement Plan assets renders all of the company's actions after termination of the Retirement Plan, null and void. On this ground, PBGC now moves for summary judgment pursuant to Fed.R.Civ.P. 56(b). It is difficult to fathom how PBGC could not have been aware of this claim at the time it moved to dismiss the complaint in August of 1982. Nevertheless, no party has objected to consideration of the motion.

out by the plan administrator. There is no assertion on this motion that the allocation and distribution were improper in any respect or that there was a breach of fiduciary duty by the employer who in fact exercised the responsibility to allocate and distribute.

For the reasons discussed below, PBGC's motion is denied.[2]

### BACKGROUND

Familiarity with an earlier decision in this case, *District 65, UAW v. Harper & Row, Publishers, Inc.*, 576 F.Supp. 1468 (S.D.N.Y.1983), is assumed, and only those facts necessary for the disposition of this motion are set out in this opinion.

The Retirement Plan was a defined employee benefit plan within the meaning of sections 3(2) and 3(35) of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. §§ 1002(2) and 1002(35). Harper & Row created the Retirement Plan Committee ("the Committee") to act as the plan administrator, as that term is defined in section 3(16)(A)(i) of ERISA. 29 U.S.C. § 1002(16)(A)(i). Section 7.03 of the Retirement Plan charged the Committee with "the operation and administration of the Plan" and granted to it "all powers necessary to discharge its duties."

The assets of the Retirement Plan were held in a trust fund governed by the Trust Agreement. Article 11 of the Trust Agreement provided, in relevant part:

In the event of termination of the trust, all cash, securities and other property then constituting the Fund ... shall be paid over or delivered by the Trustee to or on order of the Committee, subject to the provisions of ERISA.

The Retirement Plan described the Committee's duties upon termination. Section 9.02 provided that "[u]pon a termination or partial termination of the Plan ... (1) the Committee shall remain in existence." Section 9.03 provided with respect to allocation of assets:

Upon termination of the Plan ... the Committee may in its sole discretion direct the Trustees to allocate the Trust Fund ... among Members, Former Members and Beneficiaries....

Section 9.04 provided:

Upon a termination of the Plan by an Employer, the Committee may terminate the Trust Fund, ... subject to the approval of the Pension Benefit Guaranty Corporation and the Internal Revenue Service. In the event of such termination, the Trustees shall distribute the allocated shares of each affected individual entitled thereto under Section 9.03 in one of the two following ways, the method to be selected in the case of each individual being in the complete discretion of the Committee: (a) in one lump sum, or (b) by the purchase of a nontransferable annuity contract.

In August 1981, Harper & Row filed with PBGC a "Notice to PBGC of Intent to Terminate the Harper & Row, Publishers, Inc. Retirement Plan," setting August 31, 1981 as the proposed date of termination of the Retirement Plan. The Notice was signed by the Harper & Row, Publishers, Inc. Retirement Plan Committee by Chester B. Logan, Harper & Row's Vice-President of Personnel, as Secretary of the Committee, and by Edward A. Miller, General Counsel and Vice-President of Harper & Row, as a Member of the Committee. (Joint Pretrial Order, Stipulated Facts ("Stipulated Facts"), ¶ 56).

The decision to terminate the Retirement Plan was part of an effort on Harper & Row's part to raise capital to purchase the nearly one-third of its outstanding shares held by MST. Harper & Row stockholders, employees and retirees were notified in August 1981 of Harper & Row's intention to terminate the Retirement Plan and purchase the stock.

---

**2.** Harper & Row also seeks by cross-motion for summary judgment a determination regarding the reasonableness of the interest rate Prudential used to calculate benefits. In accordance with the motion schedule established at pre-trial conference, answering papers have not yet been submitted. Since Harper & Row's cross-motion is not ripe for decision, it is not addressed in this opinion.

In November 1981, PBGC issued a Notice of Sufficiency pursuant to section 4041(b) of ERISA, 29 U.S.C. § 1341(b), which stated that the assets of the Retirement Plan would be sufficient to satisfy all obligations for guaranteed benefits. (Stipulated Facts, ¶ 84). On December 9, 1981, Harper & Row shareholders approved the proposed transactions at its annual meeting.

To fund the benefits accrued in the Retirement Plan, Harper & Row, through its actuarial consultants Tower, Perrin, Foster & Crosby, invited three insurance companies to submit bids. (Stipulated Facts, ¶ 60). Prudential Insurance Company ("Prudential"), Metropolitan Life Insurance Company and The Travelers Insurance Companies submitted bid proposals which were received by Tower, Perrin, Foster & Crosby on September 14 and 15, 1981.[3] (Stipulated Facts, ¶ 62). Based on the comparative cost of the bids, Norman L. Cannon, Harper & Row's Senior Vice-President and Treasurer, who was the chairman of the Retirement Committee, recommended to Brooks Thomas, Harper & Row's Chief Executive Officer, the selection of Prudential.

On September 16, 1981, Harper & Row entered into a contract with Prudential accepting the terms of its bid. According to the terms of the bid, Prudential was to purchase annuities for the present value of the accrued benefits for those members of the Retirement Plan whose accrued benefits had a present value of at least $1,000 and to pay lump sum amounts to the other participants. (Stipulated Facts, ¶ 99). The arrangement with Prudential was later amended to provide that those participants with benefits of an accrued present value of between $250 and $1,000 could opt to receive either a lump sum payment or an annuity. (Stipulated Facts, ¶¶ 104, 105, 107). As a result of the liquidation of the retirement fund, approximately 9.8 million dollars was recaptured by Harper & Row.

It is undisputed that the Committee played no role in connection with the termination of the Retirement Plan, the selection of Prudential, or Prudential's subsequent decisions regarding funding of benefits.

The termination of the Retirement Plan gave rise to two lawsuits against Harper & Row and the other defendants—one by District 65 of the United Auto Workers Union ("District 65"), the union which represented approximately fifteen percent of the Harper & Row employees, and individual members of District 65; the other, by individual members of the Retirement Plan. Plaintiffs claim that Harper & Row, MST and Prudential violated their fiduciary duties under ERISA in terminating the Retirement Plan and distributing the excess assets to Harper & Row. They also challenge the reasonableness of the interest rate of fifteen percent which Prudential used in 1981 to calculate the then present value of employees' accrued benefits. An earlier decision in these actions by Judge Duffy on defendants' motions to dismiss the complaints resulted in a consolidation of the two actions for pre-trial purposes and the dismissal of several of plaintiffs' numerous claims. *District 65, UAW v. Harper & Row, Publishers, Inc.,* 576 F.Supp. 1468 (S.D.N.Y.1983). Judge Duffy held that District 65 had no standing to sue on the ERISA claims, although the individual union members were proper plaintiffs with respect to the ERISA claims. He also found that Harper & Row's decision to terminate the Retirement Plan was exempt from ERISA's fiduciary standards. *Id.* at 1478. PBGC does not contest Judge Duffy's holding on this issue. Finally, Judge Duffy ruled that there was no violation of ERISA in the reversion of the surplus assets of the plan to Harper & Row after the distribution of accrued benefits. *Id.* at 1479. The court left open the issue of the reasonableness of the interest rate utilized to calculate the lump sum payments, on the

---

**3.** The amounts of the bids were as follows: Prudential, $6,173,162; Metropolitan Life Insurance Company, $6,515,300; and The Travelers Insurance Companies, $8,285,780. As Harper & Row points out, PBGC regulations do not re-

quire a plan to obtain a qualifying bid from more than one insurer unless the plan assets would not be sufficient if the sole bid were accepted.

ground that a factual question existed which precluded summary judgment.

## DISCUSSION

The narrow issue presented by this motion is what is the appropriate remedy under ERISA when the allocation and distribution of the assets of a terminated retirement plan are carried out by persons or entities other than the plan administrator.

### 1. *The Positions of the Parties*

Section 403(d) of ERISA provides:

(1) Upon termination of a pension plan ... the assets of the plan shall be allocated in accordance with the provisions of section 1344 of this title, except as otherwise provided in regulations of the Secretary.

29 U.S.C. § 1103(d)(1).

Section 4044 of ERISA, 29 U.S.C. § 1344, sets out the procedures to be followed upon termination of an employee benefit plan. Section 4044 describes the method of allocating assets and provides in pertinent part that "the plan administrator shall allocate the assets of the plan ... among the participants and beneficiaries of the plan in the following order." 29 U.S.C. § 1344.

The regulations promulgated pursuant to these sections provide the following:

§ 2618.3 General Rule. (a) *Asset Allocation.* Upon the termination of a non-multiemployer plan, the plan administrator shall allocate the plan assets available to pay for benefits under the plan in the manner prescribed by this part.

§ 2618.4 Violations. (a) *General.* A plan administrator violates the Act if plan assets are allocated or distributed upon termination in a manner other than that prescribed in section 4044 of the Act and this part....

Relying on a literal reading of section 4044 and the regulations promulgated pursuant thereto, PBGC contends that only the named plan administrator is authorized to allocate and distribute the assets of a terminated plan. It contends that all acts of Harper & Row with regard to the terminated plan assets were invalid because Harper

& Row was not the plan administrator. PBGC argues that even if Harper & Row followed the statutory and regulatory procedures and met the standard of care required of a fiduciary, the plan administrator violated its fiduciary duty by failing to act, and must be replaced by a court appointed plan administrator. By its motion for summary judgment, PBGC seeks to nullify the entire distribution of assets to all participants as void, *ab initio.*

Harper & Row contends that once the decision to terminate had been reached as part of the business decision of the corporation, the remaining acts of distribution and allocation were ministerial in nature and dictated by statute and, therefore, are exempt from the fiduciary requirements of ERISA. It contends that ERISA exempts from its fiduciary requirements the allocation and distribution of assets upon termination of a plan. In support of this argument, Harper & Row points to the statutory language of section 404(a), setting forth the "prudent man standard of care," to which a fiduciary of a plan is held:

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.

29 U.S.C. § 1104(a)(1). Section 403(c)(1), which provides that the assets of a plan shall be used for the exclusive purposes of plan beneficiaries also provides "[e]xcept as provided ... under section 1344." 29 U.S.C. § 1103(c)(1). Harper & Row contends that by making the fiduciary requirements of these sections "subject to" section 4044, ERISA excepts such acts from the acts which are considered fiduciary.

Harper & Row also points to section 406 which lists "prohibited transactions" in which a fiduciary of a plan may not engage. Among the transactions prohibited between a fiduciary and the plan is "(1) deal[ing] with the assets of the plan in his own interest or for his own account...." 29 U.S.C. § 1106(b)(1). However, section 408(b) exempts from such prohibited transactions:

(9) The making by a fiduciary of a distribution of the assets of the plan in accordance with the terms of the plan if such assets are distributed in the same manner as provided under section 1344 of this title (relating to allocation of assets).

Harper & Row claims that its position was accepted by Judge Duffy and is the law of the case:

Thus, the District 65 and Harwood plaintiffs erroneously seek to have the fiduciary provisions in ERISA applied to the decision to terminate and the arrangements made as a consequence to that decision.

*District 65, UAW,* 576 F.Supp. at 1478. Finally, Harper & Row argues that even if the court were to regard the decisions made by Harper & Row with respect to the allocation and distribution of the Plan assets as fiduciary, the actions that were taken were reasonable and the relief sought by PBGC is inappropriate.

2. *Activities Undertaken by Harper & Row with Respect to the Terminated Plan Are Subject to the Fiduciary Standards of ERISA*

As defined in Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A):

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Congress' intention was to spread a broad protective net of fiduciary responsibility. The definition of fiduciary "includes persons who have authority and responsibility with respect to the matter in question, regardless of their formal title." H.R.Rep. No. 1280, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 5038, 5103. In interpreting sec-

tion 3(21)(A), courts have focused on the function performed rather than on the position held to determine whether a person is acting as a fiduciary within the meaning of ERISA. *See Blatt v. Marshall and Lassman,* 812 F.2d 810 (2d Cir.1987).

■ ERISA imposes fiduciary status on an employer only when and to the extent that the employer itself exercises discretion or control with respect to an activity enumerated in the statute. *See, e.g., Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323, 1325 (9th Cir.1985). For example, members of a corporate board of directors have been considered fiduciaries of a pension plan, to the extent that they had responsibility for selecting and retaining plan administrators. *Leigh v. Engle,* 727 F.2d 113, 133–134 (7th Cir.1984).

In *Amato v. Western Union International, Inc.,* 773 F.2d 1402, 1416–17 (2d Cir.1985), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986), the Second Circuit agreed with the district court's conclusion that "ERISA permits employers to wear 'two hats,' and that they assume fiduciary status 'only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Id.* at 1416–17, quoting *Amato v. Western Union International, Inc.,* 596 F.Supp. 963, 968 (S.D.N.Y.1984).

■ Harper & Row claims that upon termination of the Plan, the remaining responsibilities were not of a fiduciary nature because the procedures they followed were enumerated in ERISA and the PBGC regulations, and, therefore, they involved no discretion on Harper & Row's part. This definition of fiduciary ignores the portion of section 3(21)(A) which provides that a person is a fiduciary with respect to a plan to the extent he "exercises any authority or control respecting management or disposition of [a plan's] assets." 29 U.S.C. § 1002(21)(A)(i). For purposes of this portion of the statute, fiduciary status is not premised on the existence of discretion.

In a recent opinion by the Second Circuit, the court reversed a district court's finding

that an employer that participated in a multiemployer benefit plan was not a fiduciary. *Blatt v. Marshall and Lassman,* 812 F.2d 810 (2d Cir.1987). The district court's determination was based on the facts that the employer did not render investment advice to the plan for a fee and did not have any discretionary role in administering the plan. Rather, the employer's responsibility to the plan was said to be merely a ministerial one. In reversing, the Second Circuit relied on that portion of section 3(21)(A)(i) set forth in the preceding paragraph and concluded that "[the employers] acted as fiduciaries in this case because they exercised *actual* control over the disposition of plan assets." *Id.* at 813. (Emphasis in original). The court held that the return of contributions to plan participants constituted "one method of disposition of plan assets," and that defendants were fiduciaries "to the extent of this actual control." *Id.*

In addition, Harper & Row's characterization of its activities as solely ministerial and nondiscretionary is not accurate. Harper & Row's selection of an insurance carrier required a discretionary decision on its part. Although, as Judge Duffy recognized, an employer may terminate a retirement plan free of the fiduciary obligations of ERISA, *District 65, UAW,* 576 F.Supp. at 1477–78, decisions regarding the disposition of plan assets upon termination, including the selection of an insurer to carry out that function, constitute discretionary acts that affect the assets of a pension plan. Therefore, under the first portion of section 3(21)(A), which imposes fiduciary status on an entity that exercises "any discretionary authority" with respect to a plan, Harper & Row is also liable as a fiduciary, because its acts with respect to implementing the termination decision required discretionary decisions on its part.

Harper & Row's argument that it is the law of this case that its activities subsequent to the termination are not subject to the fiduciary standards of ERISA is based on an overly broad reading of Judge Duffy's decision. Judge Duffy expressly stated: "For the following reasons, I hold that the *decision to terminate* the Retirement Plan is exempt from ERISA's fiduciary standards." *District 65, UAW,* 576 F.Supp. at 1477 (emphasis added). Although later in the opinion Judge Duffy uses broader language referring to "the decision to terminate and the arrangements made as a consequence to that decision," he goes on to hold that "plaintiffs' claims are dismissed ... to the extent that a breach of fiduciary duty was alleged to have occurred by reason of Harper & Row's decision to terminate the Retirement Plan." *Id.* at 1478. The parties did not raise with Judge Duffy, nor did he directly rule on, the applicability of ERISA's fiduciary standards to post-termination activities.

Furthermore, the exemption provisions of section 408 do not support Harper & Row's position. As stated above, section 408 exempts from the prohibited transactions of section 406

> [t]he making by a *fiduciary* of a distribution of the assets of the plan in accordance with the terms of the plan, if such assets are distributed in the same manner as provided under section 1344 of this title (relating to allocation of assets).

29 U.S.C. § 1108(b)(9) (emphasis added). However, Harper & Row seeks a determination that the distribution of the assets of a terminated plan is a non-fiduciary function, exempt from the prohibited transactions of ERISA.

Although there is little authority on the issue of whether post-termination activities are subject to the fiduciary provisions of ERISA, two sources that have addressed this issue have reached the same conclusion that I now reach. In *Cooke v. Lynn Sand & Stone Co.,* 673 F.Supp. 14 (D.Mass.1986), the plaintiff, a beneficiary of a pension plan, challenged the methods used by the trustees of the pension plan in distributing termination benefits. The court determined that "the Trustees' conduct in this case is subject to review under ERISA's fiduciary standards." The court also found that *District 65, UAW v. Harper & Row, Publishers, Inc.,* was distinguishable because in that decision, the court was addressing only the

trustees' decision to terminate a pension plan.

On March 13, 1986, the Labor Department issued a "Letter on Fiduciary Responsibility and Plan Terminations" in which Dennis M. Kass, Assistant Secretary, stated the opinion of the Labor Department that because the activities undertaken pursuant to a decision to terminate would typically be of a discretionary nature, such activities should be considered fiduciary decisions. 13 Pens.Rep. (BNA), 472–73 (Mar. 17, 1986).

Although I have concluded that activities taken to implement the termination decision are subject to the fiduciary responsibility provisions of ERISA, it does not follow that Harper & Row's failure six years ago to turn over the implementation of the termination decision to the Committee in and of itself invalidates the entire distribution. I do not think that ERISA requires such an outcome.

Although the plain language of section 4044 requires that "the Plan administrator shall allocate" the funds of a terminated plan, PBGC has cited no cases to support its strict literal interpretation of this language. The broad thrust of ERISA is to impose fiduciary responsibility in connection with the exercise of certain functions. Although "dual loyalty" and a potentiality of conflict of interest exist when an employer also acts as an administrator or trustee of a pension plan, ERISA does not preclude an employer from serving as a plan administrator. *See, e.g., Musto v. American General Corp.,* 615 F.Supp. 1483 (M.D.Tenn.1985); *Donovan v. Bierwith,* 538 F.Supp. 463, 468 (E.D.N.Y.1981), *aff'd as modified* (on other grounds), 680 F.2d 263 (2d Cir.1982), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). In fact, section 408 expressly provides that a person may serve as a fiduciary "in addition to being an officer, agent, or other representative of an employer." 29 U.S.C. § 1108(c)(3).

The emphasis in the statutory provisions with respect to allocating and distributing the assets of a terminated plan is on ensuring that a fiduciary will assume responsibility for those tasks. PBGC is arguing that the plan administrator originally named in the plan is the only fiduciary that may implement its termination.

If this were a dispute about who should implement the termination of a newly terminated plan, PBGC would prevail. But PBGC argues that a 1981 distribution under a plan, the termination of which PBGC approved in 1981, must now be nullified. PBGC contends that all the assets distributed six years ago must now be recaptured, and that the entire process must be redone from the beginning, even if the allocation and distribution met the fiduciary standards of ERISA. At this late stage of the proceedings, I have concluded that by subjecting the entity that took responsibility for the allocation and distribution of the assets of the terminated plan to the fiduciary standards of ERISA, the safeguard provisions of ERISA are satisfied. Once Harper & Row acted as the plan administrator by implementing its termination decision, it assumed the role of plan administrator and was subject to a fiduciary standard of care in distributing and allocating benefits in accordance with the requirements of section 1344 and PBGC regulations.

## CONCLUSION

For the reasons discussed above, PBGC's motion for summary judgment is denied. This decision leaves open the question of whether Harper & Row's conduct in allocating and distributing the plan assets conformed to its fiduciary obligations under ERISA.

SO ORDERED.